331 F.3d 78
 Elisa ENCARNACION o/b/o Arlene GEORGE, a minor; Ana Felipe o/b/o Victoria Felipe, Margarita Guzman o/b/o Eric Garcia, and Sandra Perez o/b/o Maurice Perez, on behalf of themselves and all other persons similarly situated, Plaintiffs-Appellants,
v.
Jo Anne B. BARNHART, Commissioner of Social Security, Defendant-Appellee,
 Docket No. 02-6192.
 United States Court of Appeals, Second Circuit.
 Argued: February 26, 2003.
 Decided: May 28, 2003.
 
 Jeffrey S. Trachtman, Kramer Levin Naftalis & Frankel LLP, New York, NY; (James M. Baker, Christoper J. Bowes, Michelle R. Duran, Kenneth Rosenfeld, Center for Disability Advocacy Rights, Inc, New York, NY; Matthew J. Chachere, Northern Manhattan Improvement Corp. Legal Services, New York, NY, on the brief) for Plaintiffs-Appellants Elisa Encarnacion o/b/o Arlene George; Ana Felipe o/b/o Victoria Felipe; Margarita Guzman o/b/o Eric Garcia; Sandra Perez o/b/o Maurice Perez; and all others similarly situated.
 Susan D. Baird, Assistant United States Attorney (James B. Comey, United States Attorney for the Southern District of New York, Gideon A. Schor, Assistant United States Attorney, on the brief) for Defendant-Appellee Jo Anne B. Barnhart, Commissioner of Social Security.
 Richard P. Weishaupt, Jonathan M. Stein, Robert Lukens, Community Legal Services, Inc., Philadelphia, PA; Ira Burnim, Jennifer Mathis, Judge David L. Bazelon Center for Mental Health Law, Washington, D.C., for Amici Curiae American Psychiatric Association, National Mental Health Association, National Alliance for the Mentally Ill, American Orthopsychiatric Association, Children's Defense Fund, Children's Rights Inc., & New York State Association of School Psychologists.
 Before: STRAUB, KATZMANN, and RAGGI, Circuit Judges.
 Circuit Judge RAGGI concurs in a separate opinion.
 KATZMANN, Circuit Judge.
 
 
 1
 The Plaintiffs are parents, appearing on behalf of their own minor children as well as a proposed class of similarly situated children, all of whom have sought and were denied benefits under the federal Supplemental Security Income for the Aged, Blind, and Disabled program, 42 U.S.C. §§ 1381-1383f (2000) ("SSI"). The Social Security Administration ("SSA") administers the SSI program and issues regulations setting out guidelines for determining eligible claimants. SSA's regulations currently provide that claimants under the age of 18 shall be analyzed according to how well the child is capable of performing, relative to other children of comparable age, in six distinct "domains" of functioning. Only claimants who exhibit "marked" limitations in two domains, or an "extreme" limitation in a single domain, may be found eligible. The parties agree that SSA has an informal policy, essentially an interpretation of its own regulations, under which multiple limitations, each of which are less severe than "marked," cannot be added together across domains to serve as the equivalent of a single "marked" or "extreme" limitation. The complaint below alleged that, as a result of this policy, SSA failed to find that the plaintiffs suffered from two marked or one extreme limitation. The plaintiffs allege further that the SSA's interpretation is an unreasonable reading of the statute; specifically, that it is contrary to a statutory provision directing that "the combined impact of [all of the claimants's] impairments shall be considered throughout the disability determination process." 42 U.S.C. § 1382c(a)(3)(G). We agree with the plaintiffs that the SSA's policy would be contrary to the statute if the SSA gave no weight to some of a claimant's impairments in appraising the claimant's level of disability. Because, however, we determine that the regulations provide sufficient consideration of "the combined impact" of multiple impairments within individual domains, we affirm.
 
 BACKGROUND
 The Statute and Regulations Prior to 1996
 
 2
 Congress's 1972 overhaul of the Social Security Act produced the Supplemental Security Income ("SSI") program, an ambitious network of transfer payments to needy individuals who, for various reasons, were unable to work. Pub L. No. 92-603, § 301, 86 Stat. 1329, 1465 (1972) ("the Act"). Although the predominant focus of the legislation was benefits for adults, Congress included a provision making disabled children eligible for SSI payments, as well. Id., 86 Stat. at 1471.
 
 
 3
 The 1972 statute defined "disability" slightly differently for children and adults. An adult would be "considered to be disabled for the purposes of [SSI] if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." Id. (codified as amended at 42 U.S.C. § 1382c(a)(3)(A)). A child under 18 would be considered disabled, however, "if he suffers from any medically determinable physical or mental impairment of comparable severity" to that which would disable an adult. Id. The Social Security Administration, which was charged with administering SSI, designed a multi-stage process for determining whether an adult was disabled under the statute. See Bowen v. Yuckert, 482 U.S. 137, 140, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). In general, the Commissioner first asked whether the applicant was engaged in any substantial gainful activity. Id. If so the applicant was statutorily ineligible for benefits. The Commissioner then attempted to determine whether the claimant's disability was "below a threshold level of medical severity," id. at 149 n. 3, 107 S.Ct. 2287, such that it could not plausibly leave an applicant unable to engage in gainful activity. Id. at 141, 153, 107 S.Ct. 2287. The Supreme Court described the remaining stages of the process:
 
 
 4
 If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step, which determines whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity. [20 C.F.R. §§ 404.1520(d), 416.920(d) (1986)]. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is conclusively presumed to be disabling, the evaluation proceeds to the fourth step, which determines whether the impairment prevents the claimant from performing work he has performed in the past. If the claimant is able to perform his previous work, he is not disabled. [Id. §§ 404.1520(e), 416.920(e)]. If the claimant cannot perform this work, the fifth and final step of the process determines whether he is able to perform other work in the national economy in view of his age, education, and work experience. The claimant is entitled to disability benefits only if he is not able to perform other work. [Id. §§ 404.1520(f), 416.920(f)].
 
 
 5
 Yuckert, 482 U.S. at 141-42, 107 S.Ct. 2287.
 
 
 6
 After a delay of several years, SSA at length issued regulations for identifying disability in children. See Sullivan v. Zebley, 493 U.S. 521, 537 n. 19, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990); see also S.Rep. No. 94-1265, at 24-25, reprinted in 1976 U.S.C.C.A.N. 5997, 6018-19 (discussing SSA's failure to issue meaningful regulations for childhood disability). Its formulation was "an abbreviated version of the adult test." Zebley, 493 U.S. at 526, 110 S.Ct. 885. After screening for gainful activity and non-severe impairment, the SSA asked only whether the child's impairments "matche[d] or medically equal[ed]" its listing of impairments that would presumptively disable a child. Id. (citing 20 C.F.R. §§ 416.924(b)(2), (3) (1989)). If a child did not qualify under those listings, he or she was denied benefits. Id.
 
 
 7
 SSA's disability-determination process for children underwent a pair of significant changes prior to 1996. The first arose out of Congress's response to SSA's policy towards individuals suffering from multiple impairments. In a regulation enacted in 1982, the Secretary announced that where a claimant had multiple impairments, SSA would consider whether those impairments in combination prevented the claimant from working only if each one of the impairments individually was above the "severe" threshold. See Kolodnay v. Schweiker, 680 F.2d 878, 880 (2d Cir.1982) (citing 20 C.F.R. § 416.922 (1982)). At the same time, the SSA ruled that it would not find that a claimant was "severely" disabled unless he or she had at least one impairment that in itself was severe.[1] See Dixon v. Heckler, 589 F.Supp. 1494, 1508 (S.D.N.Y.1984) (citing Soc. Sec. Ruling 82-55). The effect of the two decisions was that SSA gave no consideration to individual impairments that were less than "severe." Congress ultimately rejected both regulations, finding that "[SSA's] policy may preclude realistic assessment of those cases involving individuals who have several impairments which in combination may be disabling." H.R. Conf. Rep. 98-1039, at 30, reprinted in 1984 U.S.C.C.A.N. 3080, 3087-88. It therefore enacted a new provision, providing that:
 
 
 8
 In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether such impairment, if considered separately, would be of such severity.... [T]he combined impact of the impairments shall be considered throughout the disability determination process.
 
 
 9
 42 U.S.C. § 1382c(a)(3)(G) (2000).
 
 
 10
 SSA's second major revision followed the Supreme Court's decision in Zebley, in which the Court held that SSA's child disability regulations failed to "carry out the statutory requirement that SSI benefits... be provided to children with `any ... impairment of comparable severity' to an impairment that would make an adult `unable to engage in any substantial gainful activity.'" 493 U.S. at 541, 110 S.Ct. 885 (quoting 42 U.S.C. § 1382c(a)(3)(A) (1988)). The Court observed that, although the adult evaluation process included an individualized functional analysis of each claimant, children were limited to demonstrating that their impairments were medically equivalent to one of the Secretary's finite set of presumptively disabling impairments. Id. at 526, 110 S.Ct. 885. An adult claimant could prevail at the individualized functional analysis stage by showing that his or her impairments prevented him or her from engaging in substantial gainful activity. Id. at 534-35, 110 S.Ct. 885. By contrast, the Secretary's listings of presumptively disabling childhood disabilities were comprised of impairments that would prevent any gainful activity. Thus, the practical effect of holding children only to the listings was that they were required to show that they were more disabled than an eligible adult. Id. at 535-36, 110 S.Ct. 885. The listings also were not comprehensive, so that many unlisted impairments or combinations of impairments were not recognized as disabling, even when it was "obvious" that the claimant should have been eligible. Id. at 533-34, 110 S.Ct. 885. Indeed, the Court suggested that the absence of a functional assessment step would often frustrate the purpose of the 1984 amendment requiring the Secretary to consider the combined effect of all of the claimant's disabilities. Id. at 535 & n. 16, 110 S.Ct. 885. As a result, many children with disabilities of "comparable severity" to those that would disable adults were ruled ineligible. Id. at 537-38, 110 S.Ct. 885.
 
 
 11
 In response, SSA amended its child disability regulations to ensure that children would be better able to demonstrate that they were entitled to benefits under the statute. See Supplemental Security Income; Determining Disability for a Child Under Age 18, 56 Fed.Reg. 5534 (Feb. 11, 1991) (codified at 20 C.F.R. §§ 416.924, 416.926). Because most children do not work, SSA could not simply install a new step in its process asking whether the child's impairments prevented the child from engaging in substantial gainful activity. Id. at 5535. Instead, SSA attempted to determine whether the child's impairments "so limit[] his or her physical or mental abilities to function independently, appropriately, and effectively in an age-appropriate manner that the limitations are comparable in severity to those which would disable an adult." Id. at 5538.
 
 
 12
 In order to assist its examiners in making that judgment, SSA implemented a new procedure, the "individualized functional assessment," or "IFA." Id.; see generally Hickman v. Apfel, 187 F.3d 683, 687-88 (7th Cir.1999) (describing four-step process for analyzing child disability prior to 1996 amendments). The hallmark of the IFA was that it identified six (or in the case of infants and toddlers, five) categories of childhood activity, which the regulations called "domains" of functioning. See 20 C.F.R. § 416.924c (1992). The regulations established non-binding guidelines for using the domains to find functional disability. In most cases, the regulations said, a child is disabled if he or she suffers from "marked" limitations in his or her ability to carry out the functions described in one of the domains, plus "moderate" limitations in his or her functioning in any other domain.[2] See Quinones v. Chater, 117 F.3d 29, 34 (2d Cir.1997) (citing 20 C.F.R. §§ 416.924d(c), (h), 416.924e(c)(2)(i), (ii) (1996)). Alternately, three moderate limitations could also constitute disability. Id. There was a hierarchy of limitations, with "extreme" being almost totally non-functioning, "marked" somewhat more functional than that, continuing to "moderate," from there to "severe," which is defined as "more than minimal," see 20 C.F.R. § 416.924(c) (2002), and down to unnamed limitations less disabling than "severe."
 
 The 1996 Amendments
 
 13
 Congress revisited the subject of SSI benefits for children in 1996 with the enactment of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub.L. No. 104-193, §§ 211 to 212, 110 Stat. 2105, 2188-94 (1996) (the "Welfare Reform Act"). The Welfare Reform Act's new definition provides that a child under eighteen years of age is "disabled" if the child "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i) (2000). The thrust of the legislation was most certainly to tighten eligibility. See H.R. Conf. Rep. No. 104-725, at 261, reprinted in 1996 U.S.C.C.A.N. 2649, 2649 (noting that the Welfare Reform Act aimed to "reform[] the [SSI] disability program to strengthen eligibility requirements ... for ... children"). A House Budget Committee Report on an early draft of the 1996 legislation indicated that "the committee expects no less than marked limitations in no fewer than two domains or extreme limitations in at least one domain as the standard of qualification." H.R.Rep. No. 104-651, at 1385 (1996). After some revisions to the pertinent statutory language, the Conference Report accompanying the new legislation noted that "[i]n those areas ... that involve domains of functioning, the conferees expect no less than two marked limitations as the standard for qualification." H.R. Conf. Rep. No. 104-725 at 328, reprinted in 1996 U.S.C.C.A.N. at 2716. Moreover, the Conference Report explained that the statutory term "severe" was intended "in its common sense meaning" rather than in the technical sense SSA applied in its regulations. Id.
 
 
 14
 Additionally, Congress directed SSA to discontinue the IFA procedure, see Pub.L. No. 104-193 § 211(b)(2), 110 Stat. at 2189, but noted in the Conference Report that it did "not intend to limit the use of functional information, if reflecting sufficient severity and ... otherwise appropriate." H.R. Conf. Rep. No. 104-725, at 328, reprinted in 1996 U.S.C.C.A.N. at 2716. In emphasizing their expectation that SSA would "ensure that the combined effects of all the physical or mental impairments of an individual under age 18 are taken into account," the conferees observed that "the 1990 Supreme Court decision in Zebley established that SSA had been previously remiss in this regard." Id.
 
 
 15
 In response to the legislation, SSA issued a new set of regulations reconstituting the procedures for determining childhood disability. See Supplemental Security Income; Determining Disability for a Child Under Age 18, 62 Fed.Reg. 6408 (Feb. 11, 1997) (codified at 20 C.F.R. Parts 404 and 416). SSA's new rules set up a three-step process, under which the administrative law judge ("ALJ") or other examiner must determine (1) that the child is not engaged in substantial gainful activity; (2) that the child has an impairment or combination of impairments that is severe; and (3) that the child's impairment meets or equals an impairment listed in Appendix 1, Subpart P of 20 C.F.R. § 404.
 
 
 16
 In making the third determination—whether a child's impairment meets or equals a listed impairment—the ALJ must consider whether the impairment, alone or in combination with another impairment, "medically equals, or functionally equals the listings."[3] Functional equivalency means that the impairment is of "listing-level severity; i.e., it must result in `marked' limitations in two domains of functioning or an `extreme' limitation in one domain...." 20 C.F.R. § 416.926a(a). A marked limitation is one that interferes seriously with the child's "ability to independently initiate, sustain, or complete activities." Id. § 416.926a(e)(2)(i). The ALJ considers how a child functions in his activities "in terms of six domains": "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well-being." Id. § 416.926a(b)(1).[4] The regulations provide that a child must be found to be disabled if he or she has an impairment or impairments of "listing-level severity," that is, an "extreme" limitation in one of these domains, or "marked" limitations in two or more domains. 20 C.F.R. § 416.926a(a).
 
 The Commissioner's Interpretation
 
 17
 The Plaintiffs' challenge in this case focuses not on the regulations themselves but a particular interpretation of the regulations issued by the Commissioner. The Report of the Committee on Conference accompanying the Welfare Reform Act, as we noted, indicated that Congress expected "no less than two marked limitations as the standard for qualification." H.R. Conf. Rep. No. 104-725, at 328, reprinted in 1996 U.S.C.C.A.N. at 2716. On its face, this language appears to leave open the possibility that limitations of differing degrees might be substitutable for one another at some rate of exchange, so that more than two less-than-marked limitations might nonetheless be the equal of two marked. Indeed, the SSA apparently adopted a similar logic in concluding that a single "extreme" limitation, 20 C.F.R. 416.926a(a), is "no less than two marked," H.R. Conf. Rep. No. 104-725, at 328, reprinted in 1996 U.S.C.C.A.N. at 2716. According to the Commissioner, however, two or more moderate limitations in different domains of functioning cannot be treated as the equivalent of, or "added up to equal[,] a `marked' limitation." Social Security Administration, Childhood Disability Training: Student Manual, Pub. No. 64-075, at Tab F p. 15. The Commissioner reasoned that "to revise the disability standard to include children with impairments of less than listing-level severity (e.g., one marked and one moderate limitation or three moderate limitations in `crucial' areas) would, in essence, result in the same level of severity we used when we performed an IFA under the prior law." See Supplemental Security Income; Determining Disability for a Child Under Age 18, 65 Fed.Reg. 54,747, 54,763 (Sept. 11, 2000) (codified at 20 C.F.R. Part 416). In effect, once the examiner has assessed the level of limitation in each of the claimant's domains, moderate limitations drop out of the equation, and the number of marked or extreme limitations is counted to determine whether the claimant is eligible.
 
 Parties and Procedural History
 
 18
 The lead named Plaintiff, Arlene George, applied for and was denied SSI disability benefits. On September 1, 2000, she filed suit (through her mother, Elisa Encarnacion) in the United States District Court for the Southern District of New York (Laura Taylor Swain, J.) to challenge the adverse determination of the SSA. Encarnacion then filed an Amended Complaint, joining a new Plaintiff, Victoria Felipe (by her mother, Ana Felipe). The Amended Complaint alleged both individual factual and procedural deficiencies in the SSA's rulings on both Plaintiffs' claims, as well as a putatively class-wide claim that the SSA was improperly administering the statute and regulations. Encarnacion and Felipe moved for class certification. Felipe then received a favorable determination from the SSA Appeals Council, and the District Court dismissed her individual claim as moot, but allowed her to remain as a class representative. In addition, the Plaintiffs filed a Second Amended Complaint, adding two more named plaintiffs, Eric Garcia (via Margarita Guzman) and Maurice Perez (through Sandra Perez). The SSA agreed to grant benefits to Garcia and Perez, so that the District Court again dismissed their individual claims, but retained both as class representatives.
 
 
 19
 Ultimately, the District Court rejected the Plaintiffs' substantive class-wide claims. Ruling on the Defendant's Motion for Judgment on the Pleadings, the District Court held that the Commissioner's interpretation was entitled to Chevron deference. See Encarnacion v. Barnhart, 191 F.Supp.2d 463, 472-75 (S.D.N.Y.2002). Although the court acknowledged that the regulations do not expressly contain the non-combination policy, it found that such a reading was a "reasonable, obvious construction of the language of the regulation." Id. at 472. Alternatively, it noted that even if the regulation were not a "legislative" rule, it would still be entitled to deference under Christensen v. Harris County, 529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). Encarnacion, 191 F.Supp.2d at 475. In addition, the District Court denied the Plaintiffs' motion for class certification, essentially ruling that it would defer consideration of that question pending the result of this appeal. Id. at 469.
 
 
 20
 This appeal followed. The district court had jurisdiction pursuant to 28 U.S.C. §§ 1361. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.
 
 DISCUSSION
 I.
 A.
 
 21
 The scope of our review in this case is limited by the allegations of the complaint below. The Plaintiffs' principal argument is that the Commissioner's interpretation, which forbids adding "moderate" limitations across domains to equal a "marked" or "extreme" limitation, is contrary to the Act because it prevents ALJs from "consider[ing] the combined effects of all of the individual's impairments," 42 U.S.C. § 1382c(a)(3)(G), as the statute now requires. The Commissioner argues, and we agree, that her interpretation is not contrary to law if there are other reasonable methods of giving effect to the "combined impact" mandate other than by adding limitations across domains. Because we read the regulations, and the Commissioner's accompanying interpretation, to leave open such other routes, and because the Complaint does not allege that these alternatives are ineffective either on their face or as applied, we are compelled to affirm the district court's decision to dismiss the complaint.[5]
 
 
 22
 To begin with, we recognize that an agency's interpretation of its own regulations is entitled to considerable deference, irrespective of the formality of the procedures used in formulating the interpretation. See Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 779-80 (2d Cir.2002) (citing Auer v. Robbins, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997)); LaFleur v. Whitman, 300 F.3d 256, 277 (2d Cir.2002). We defer to an agency's interpretation of its own regulations because we "presume that the power authoritatively to interpret [the agency's] own regulations is a component of the agency's delegated lawmaking powers." Martin v. Occupational Safety & Health Rev. Com'n, 499 U.S. 144, 151, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991). Because it would make no sense to presume that Congress had the general intent to delegate to an agency the power to contradict Congress's clearly expressed specific intent in some other matter, we will not defer when an interpretation is clearly contrary to any statute. See N.Y. Currency Research Corp. v. CFTC, 180 F.3d 83, 87, 92 (2d Cir.1999).
 
 
 23
 Therefore, as a reviewing court, we are not free to substitute our policy judgment for that of Congress or of an agency. Even if we were to prefer the plaintiffs' methodology, we are without authority to decree it if the Commissioner's interpretation is not "plainly erroneous." Taylor, 313 F.3d at 780. In this case, we cannot conclude that SSA's use of functional domain-based analysis and its focus on the combined effects of impairments within functional domains is inconsistent with Congress's intent to restrict eligibility. We defer to the Secretary's view that it is not required in a mechanical way to add impairments across domains, largely because we read SSA regulations and policy to envision that limitations in domains less than marked will be "considered throughout the disability determination process," 42 U.S.C. § 1382c(a)(3)(G).
 
 
 24
 The Plaintiffs argue that the Commissioner's interpretation is not entitled to deference because it contradicts the statutory mandate that the "combined impact of [all the claimant's] impairments shall be considered throughout the disability determination process." 42 U.S.C. § 1382c(a)(3)(G). The plain language of this provision, they argue, indicates that it is not enough that SSA merely acknowledge the existence of, or appraise the significance of, an impairment that produces only a moderate limitation. Rather, SSA must give the impairment meaningful effect throughout the disability assessment process, including those portions of the process that follow SSA's conclusion that the impairment results only in a moderate limitation in a domain that does not overlap with any other impairment. Because SSA refuses to add together moderate impairments in different domains, the Plaintiffs say, it follows that they have failed to "consider the combined impact" of the moderate impairments that are not added.
 
 
 25
 The Commissioner disputes the premise of the Plaintiffs' argument, averring that she would meet the terms of the "combined impact" provision simply by recognizing that a claimants' level of limitation within any given domain might arise out of more than one impairment. In a sense, then, SSA "combines" limitations, albeit only within domains. She argues that an impairment that produces only moderate limitations, where the moderate limitations cannot be combined with those resulting from another impairment, are still "considered," because they have the potential to be combined with other limitations.
 
 
 26
 An example may help to clarify the parties' respective positions. Suppose a claimant who suffers from three potentially disabling impairments, say, A, B, and C. Impairment A produces moderate limitations in domains one and two; B results in moderate limitations in domains two and three, and C causes a moderate limitation in domain four. The effect of A and B together is to create a marked limitation in domain two. If SSA makes no further adjustments to the level of limitation in each domain, the claimant is not eligible for benefits, because she has only one marked limitation and three moderate limitations. The Plaintiffs argue that SSA has not "consider[ed]" the combined effect of impairment C, because it was, literally, never combined. Furthermore, they claim, when SSA reaches the end of its process and counts up how many limitations there are of each type, they completely ignore the effects of C, because it failed to result, either singly or in intra-domain combination, in a marked impairment. SSA, on the other hand, maintains that it "considered the impact" of C, because it attempted to determine whether C resulted in a marked limitation.
 
 
 27
 This discussion illustrates that the crux of the Plaintiffs' argument rests on the assumption that after adding together limitations within domains, SSA makes no further adjustments to the level of limitation in each domain. Under the Plaintiffs' reasoning, the SSA unlawfully neglects the impact of impairments, such as impairment C in our example, that produce less then marked limitations in domains not affected by any other impairment. If, however, the Commissioner gives weight to such impairments throughout the disability determination process in a way other than by "adding" across domains, it would be very difficult for the Plaintiffs to maintain that the Commissioner has given the impairments no meaningful effect. In that case, the Commissioner's decision to exclude moderate limitations would simply be one of many reasonable interpretations of the statute and her own regulations.
 
 
 28
 As we indicated at the outset, we read the Commissioner's regulations and policy to give some effect to each of a claimants' impairments throughout the disability determination process. The regulations on their face instruct the ALJ to "look comprehensively at the combined effects of [a claimant's] impairments on [the claimant's] day-to-day functioning instead of considering the limitations resulting from each impairment separately." 20 C.F.R. § 416.924a(a)(4) (2002). That is, in determining a child's functional abilities, the agency will consider a single impairment in every domain it affects, no matter the degree. Further, it will assess the cumulative impact of all impairments relevant to a particular domain in assessing a child's cumulative functional limitation in that domain. The regulations indicate that, although SSA ultimately does not permit moderate limitations to give rise to a finding of eligibility, the existence of sub-marked limitations in other domains may influence the level of impairment SSA finds in any one given domain. See 20 C.F.R. § 416.926a(a) (2002) ("When we make a finding regarding functional equivalence, we will assess the interactive and cumulative effects of all of the impairments for which we have evidence, including any impairments you have that are not `severe.'"); id. § 416.926a(e)(1)(i) ("When we decide whether you have a `marked' or an `extreme' limitation, we will consider your functional limitations resulting from all of your impairments, including their interactive and cumulative effects."). Thus, it appears that the regulations permit SSA to increase a non-marked limitation up to marked to reflect the impact that other non-marked impairments may have on the claimant's overall level of functioning.
 
 
 29
 SSA's remarks accompanying its issuance of the new regulations in 1997 also suggest strongly that it believes the new regulations preserve the flexibility it enjoyed prior to the Welfare Reform Act. In a preamble to the Interim Final Rules, SSA stated that "we are retaining our prior policies on determining functional equivalence."[6] Supplemental Security Income; Determining Disability for a Child Under Age 18, 62 Fed.Reg. 6408, 6413 (Feb. 11, 1997). Under the "prior policies," as we have mentioned, the Commissioner used the degree of impairment in the functional domains only as a guideline. See Quinones v. Chater, 117 F.3d 29, 34 (2d Cir.1997). The regulations emphasized that the applicant was to be viewed as a whole, and that "[e]ach case must be evaluated on its own merits using the principles and guidelines of all the regulations addressing childhood disability." Id. (quoting 20 C.F.R. § 416.924e(c)(2) (1993)); see also id. at 37 (remanding to ALJ for consideration whether "[applicant's] impairments, taken together, amount to a qualifying disability"). Therefore, we think that when SSA announced it was "retaining [its] prior policies," it indicated that it would have the same flexibility in determining a claimant's overall level of disability, although with a somewhat more demanding minimum threshold for disability. Thus, we conclude that under current SSA regulations ALJs retain the power to account for the existence of non-marked limitations in the disability determination process, notwithstanding the formal bar on combining non-marked impairments.
 
 
 30
 At oral argument, the Plaintiffs contended vigorously that the question of whether SSA actually exercises this power in a meaningful way is a fact question not suitable for resolution in a motion under Fed. R.Civ.P. 12(c). We agree, of course, that we must treat all of the allegations of the Complaint as true. See, e.g., Patel v. Searles, 305 F.3d 130, 134-35 (2d Cir. 2002). We have searched the Complaint in vain, however, for an allegation that SSA does not, in fact, adjust the level of a claimant's limitation within one or two domains to "look comprehensively" at the claimant, 20 C.F.R. § 416.924a(a)(4) (2002), and account for the "interactive and cumulative effects" of limitations in other domains, id. § 416.926a(e). Nor is there an allegation that the domains themselves are designed in a way that would frustrate the SSA's ability to "consider" the "combined impact" of all of a claimant's impairments—as might be the case, for example, if plaintiffs could demonstrate that the defined domains omitted some significant aspect of pertinent juvenile functioning, and that there was no flexibility to account for the omission within other domains.[7]
 
 
 31
 We conclude that, although SSA may choose not to add together moderate limitations across domains to create the equivalent of a marked limitation, it does not necessarily follow that those impairments underlying the omitted moderate limitations are not "considered throughout the disability determination process." Under our understanding, nothing would preclude SSA from adjusting an otherwise moderate, but nearly marked, limitation in domain A up to fully marked to account for the effect of a limitation in domain B.
 
 B.
 
 32
 We pause to note that the flexibility to account for cumulative effects we have just described is likely essential to a permissible implementation of the Act. As we explained earlier, the Supreme Court's opinion in Sullivan v. Zebley, 493 U.S. 521, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) invalidated the SSA's then-existing procedure for assessing child disability. Id. at 541, 110 S.Ct. 885. The Court's main objection to SSA's scheme was that, by limiting children to demonstrating that their impairments were the medical equivalent of one of a finite list of presumptively disabling ailments, the regulations elevated the level of severity needed, and failed to recognize the great variability among individuals. Id. at 534-35, 539, 110 S.Ct. 885. The Court also noted that exclusive use of medical equivalence failed to "fulfill the statutory mandate" of the "combined impact" provision, as well. Id. at 535 n. 16, 110 S.Ct. 885. That is, the regulations did allow the list of symptoms that would establish medical equivalence to a single listing to be drawn from more than one impairment. But, again, the listings did not account for all possible combinations of impairments. Therefore, although SSA "considered" combined effects, in the sense that it analyzed the effects of more than one impairment to determine whether they together resulted in medical equivalence, that consideration was not "of value ... to children," because the practical result was that "within the confines of the equivalence determination" the combined effect was usually zero. Id. The Court applied the same logic in a related observation, noting that "[t]he fact that some of the listed impairments are defined in terms of functional criteria is small comfort to child claimants who do not have one of those impairments and who fail to qualify for benefits." Id. at 540 n. 21, 110 S.Ct. 885 (emphasis added).
 
 
 33
 In short, Zebley held that SSA does not sufficiently "consider the combined effect" of an impairment when it merely looks to see whether the impairment contributes an item in the medical equivalence checklist, and, if not, gives the impairment no effect at all. Thus, as with the medical equivalence test in Zebley, we cannot accept an interpretation of "consider the combined effect" where the impairment is assigned zero weight in the ultimate decision whether or not to award benefits. Nor can this approach be reconciled with the statutory requirement that the Commissioner consider "the combined impact of [all of the claimaint's] impairments throughout the disability determination process." 42 U.S.C. § 1382c(a)(3)(G) (emphasis added).
 
 
 34
 Accordingly, we conclude that the Act appears to require that each of a claimant's impairments be given at least some effect during each step of the disability determination process. A contrary interpretation of either the statute or the implementing regulations which fails to provide for the meaningful assessment of multiple impairments may not be due the same deference we accord to the SSA in this case. We emphasize, however, that the SSA has considerable flexibility in determining how best to "consider the impact" of a given impairment in assessing eligibility. For the reasons already stated, we are satisfied that the agency's policy of considering the combined impact of an impairment within every affected domain but not adding across domains is not a plainly erroneous procedure for identifying children who suffer from the sort of "marked and severe functional limitations" that render them disabled, 42 U.S.C. § 1382c(a)(3)(C)(i), particularly since SSA regulations are flexible enough to allow ALJs to "look comprehensively at the combined effects of [a claimant's] impairments," 20 C.F.R. § 416.924a(a)(4) (2002).
 
 C.
 
 35
 Finally, we must account for the Plaintiffs' contention that the Commissioner's interpretation is contrary not only to the "combined impact" provision, but also to the very purposes of the SSI statute. In other words, Plaintiffs ask that we construe the 1996 statute that sought to tighten eligibility standards in the context of the general purposes of the SSI program. In the past, we and other courts have rejected as arbitrary and capricious some of the SSA's choices regarding how best to appraise the combined effect of multiple impairments, largely because the SSA's view was inconsistent with the statutory purpose of identifying and compensating adults who could not work. See Johnson v. Sullivan, 922 F.2d 346, 352 (7th Cir. 1991) (en banc); McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1127 (1st Cir.1986); Cutler v. Weinberger, 516 F.2d 1282, 1285 (2d Cir.1975); Landess v. Weinberger, 490 F.2d 1187, 1190 (8th Cir.1974); Colwell v. Gardner, 386 F.2d 56, 74 (6th Cir.1967); Dillon v. Celebrezze, 345 F.2d 753, 757 (4th Cir.1965); Farley v. Celebrezze, 315 F.2d 704, 707-08 (3d Cir.1963); Dixon v. Heckler, 589 F.Supp. 1494, 1508 (S.D.N.Y.1984), aff'd, 785 F.2d 1102 (2d Cir.1986), rev'd on other grounds sub nom. Bowen v. Dixon, 482 U.S. 922, 107 S.Ct. 3203, 96 L.Ed.2d 690 (1987); Champion v. Califano, 440 F.Supp. 1014, 1017-18 (D.D.C.1977).
 
 
 36
 Our analysis in this regard is complicated by the fact that Congress has never clearly established the precise purposes of SSI for children.[8] The official legislative history of the 1972 Act states:
 
 
 37
 [D]isabled children who live in low-income households are certainly among the most disadvantaged of all Americans and ... they are deserving of special assistance in order to help them become self-supporting members of our society. Making it possible for disabled children to get benefits under this program, if it is to their advantage, rather than under the programs for families with children, would be appropriate because their needs are often greater than those of nondisabled children. The bill, accordingly, would include disabled children under the new program. Parents' income and resources would be taken into account ....
 
 
 38
 H.R.Rep. No. 92-231, at 147-48, reprinted in 1972 U.S.C.C.A.N. 4989, 5133-34. Some highly respectable authorities have understood this passage to indicate that Congress simply wanted to pay for the "special health care expenses ... arising out of the child's medical disability." Zebley, 493 U.S. at 546, 110 S.Ct. 885 (White, J., dissenting). We think that several other possibilities are equally plausible. For the reasons that follow, however, we need not now determine the precise objectives of the Act.
 
 
 39
 The Plaintiffs' argument appears to be that under any plausible purpose, the Commissioner must "give each claimant a personalized appraisal, accounting for the totality of his or her symptoms." Thus, this argument proceeds, just as it might defy "common sense" to ignore the combined effects of two impairments in determining whether an adult can carry out substantial gainful activity, Johnson, 922 F.2d at 352, it might defy common sense not to look at the whole child in assessing the costs of his or her care, or the likelihood that the child will ever be able to be gainfully employed in the future. This argument must go the way of the plaintiffs' first: To the extent that SSA's procedures do already allow consideration of all of the factors that are relevant to the statutory purposes, the plaintiffs have no cause for complaint. And, as we have already held, there is no allegation that SSA under its regulations cannot, or in actual cases does not, do so. Nor do the Plaintiffs allege that, in appraising the extent of a child's limitation, SSA improperly considers factors that would frustrate the statutory purpose.
 
 
 40
 Therefore, because we conclude that SSA's interpretation of the statute is permissible, and because Plaintiffs did not challenge the SSA's actual implementation of its regulations, we need not determine whether the methods utilized by SSA in assessing childhood disability are contrary to the purposes of the Act.
 
 II.
 
 41
 In sum, we hold that each of a child SSI claimant's impairments must be taken into account in SSA's bottom-line assessment of the child's disability. Because SSA's current regulations are open to a reading in which examiners are in fact free to account for the "interactive and cumulative" effects of all of the claimant's impairments, and the Plaintiffs have not alleged otherwise, we agree with the District Court that the Plaintiffs have failed to state a claim upon which relief can be granted.
 
 
 42
 Accordingly, the decision of the District Court is hereby Affirmed.
 
 
 
 Notes:
 
 
 [1]
 SSA's child disability assessment did not include a "severity" step until 1991See Supplemental Security Income; Determining Disability for a Child Under Age 18, 56 Fed.Reg. 5534, at 5538 (Feb. 11, 1991) (codified at 20 C.F.R. § 416.924).
 
 
 [2]
 The new regulations thus also introduced a new set of terminology, which it will be useful for the reader to distinguish throughout the remainder of this opinion. An "impairment" is the physical ailment afflicting the applicantSee 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.921-23. A "limitation" is the functional consequence of an impairment or combination of impairments. See 42 U.S.C. § 1382c(a)(3)(C)(i); 20 C.F.R. § 416.924.
 
 
 [3]
 SSA amended its regulations again, effective January 2, 2001, to essentially eliminate medical equivalence proceedings and to analyze all children under a functional equivalence rubricSee Supplemental Security Income; Determining Disability for a Child Under Age 18, 65 Fed.Reg. 54,747, 54,755 (Sept. 11, 2000) (codified at 20 C.F.R. Part 416). The definitions and testing results for marked and extreme disabilities, however, have not changed. See id. at 54,756. Most importantly for our purposes, the Commissioner has not changed her interpretation of the functional limitation regulations, which are the subject of the Plaintiff's challenge.
 
 
 [4]
 The 2001 regulations made two changes to the list of functional domains. They first added the last category, "health and physical well-being." Second, they changed two old categories, "cognition" and "communication," distributing communications deficits among each of the other categories, and renaming cognition as "acquiring and using information."See 65 Fed.Reg. at 54,755.
 
 
 [5]
 We reviewde novo the district court's decision to dismiss pursuant to Fed.R.Civ.P. 12(c). See, e.g., Patel v. Searles, 305 F.3d 130, 134-35 (2d Cir.2002).
 
 
 [6]
 Although the Welfare Reform Act directed SSA to discontinue the Individualized Functional Assessment,see Pub.L. No. 104-193 § 211(b), 110 Stat. 2105, 2189 (1996), we agree with SSA that Congress did not also intend to put an end to functional equivalence analysis of child claimants. Indeed, the Conference Committee report explicitly stated that "where appropriate, the conferees remind SSA of the importance of the use of functional equivalence disability determination procedures," H.R. Conf. Rep. No. 104-725, at 328, reprinted in 1996 U.S.C.C.A.N. 2649, 2716. Nor do we think SSA's reading leaves the statutory clause deleting the IFA purposeless. The elimination of the IFA indicated that, in Congress's view, the Act ought not require that an individualized functional assessment be carried out in every case. But Congress clearly expected that functional equivalence, or something like it, would still be utilized where appropriate. See id. ("[T]he conferees do not intend to suggest by this definition of childhood disability that every child need be especially evaluated for functional limitations.... Nonetheless, the conferees do not intend to limit the use of functional information, if reflecting sufficient severity and i[f] otherwise appropriate.")
 
 
 [7]
 Nothing we say in this opinion is intended to foreclose Plaintiffs from raising a future challenge to SSA's practices in these regards
 
 
 [8]
 This gap, we respectfully suggest, may explain much of the SSA's long history of struggle with the definition of childhood disability. Better guidance might do much to reduce public, judicial, and administrative confusion over the proper direction for the regulations
 
 
 
 43
 RAGGI, Circuit Judge, concurring.
 
 
 44
 I agree with my colleagues that we should affirm the district court's judgment of dismissal in this case. I write separately only to emphasize my understanding that the across-domain adjustment process that we today recognize as permitted by relevant SSA regulations does not equate to a process mandated by that part of 42 U.S.C. § 1382c(a)(3)(G)(2002) that states, "the combined impact of [all of the claimant's] impairments shall be considered throughout the disability determination process."
 
 
 45
 After carefully reviewing SSA regulations, my colleagues observe that nothing therein "would preclude SSA from adjusting an otherwise moderate, but nearly marked, limitation in domain A up to fully marked to account for the effect of a limitation in domain B." See ante at 89. I agree that SSA regulations could be interpreted by the agency to support across-domain adjustments of a claimant's limitations. Further, I agree that such an interpretation would be one way to ensure that the combined impact of a claimant's impairments is considered throughout the disability determination process. The record before us, however, suggests that the SSA does not presently engage in across-domain analysis in determining childhood disability. Instead, it considers the combined impact of a claimant's impairments only within specified domains of childhood functions. In light of this reality, I think it is important to clarify that though we consider across-domain adjustments to be permitted by SSA regulations, we do not interpret 42 U.S.C. § 1382c(a)(3)(G) to require this particular approach to childhood disability determinations.
 
 
 46
 Precisely because § 1382c(a)(3)(G) does not specify how its mandate to consider an individual's impairments "throughout the disability determination process" should be implemented by the SSA, our review of the administering agency's interpretation of the statute is deferential. See Chevron, U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
 
 
 47
 In an effort to identify those children whose "marked and severe functional limitations" render them disabled pursuant to 42 U.S.C. § 1382c(A)(3)(C)(i) (2000), the SSA has chosen to work within a system of six function domains. See 20 C.F.R. § 416.926a(b)(1)(i)-(vi); see ante at 84.[1] SSA regulations provide that a child with an "extreme" limitation in any one of these domains or "marked" limitations in two or more domains must be found disabled. See 20 C.F.R. § 416.926a(a).[2] In an effort to apply § 1382c(a)(3)(G) to its evaluation of childhood disability claims, SSA considers every impairment a child has within every domain that the impairment limits, to whatever degree. Thus, the agency recognizes that even a single moderate impairment, e.g., in hearing, might adversely affect a child in a number of function domains: the ability to acquire and use information (domain 1), the ability to attend and complete tasks (domain 2), the ability to interact with others (domain 3), the development of motor skills (domain 4), etc. Moreover, the SSA recognizes that the limiting effect of a single impairment cannot be viewed in isolation. The effect of a minor impairment might well be aggravated by other impairments affecting the same domains. For example, a minor hearing loss together with a below-average IQ could together yield a marked limitation in the child's ability to acquire and use information. Similarly, a minor hearing loss together with a mild speech defect could together result in a marked limitation in a child's ability to interact with others. An approach that thus permits impairments to be considered within multiple domains, and that then combines all impairments affecting a particular domain to determine the total level of a child's limitation in that area of functioning, is sufficiently flexible and inclusive to avoid the concerns raised by the Supreme Court in Sullivan v. Zebley, 493 U.S. 521, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) (invalidating former SSA practice of determining childhood disability claims by reference only to certain listed impairments without regard to effect on childhood functioning).
 
 
 48
 At the start of subpart B of the majority opinion, my colleagues note that "the flexibility to account for cumulative effects we have just described is likely essential to a permissible implementation of the Act," ante at 90. My understanding is that the court refers both to the flexibility available in the present SSA practice of considering the combined effect of impairments within every affected domain as well as to the flexibility afforded by the alternative across-domain adjustment process that we identify as a permissible interpretation of the agency's own regulations. It is with this understanding that I join in the court's opinion.
 
 
 
 Notes:
 
 
 [1]
 As the majority notes, appellants do not contend that the domains are deficient in identifying all pertinent aspects of juvenile functioningSee ante at 89.
 
 
 [2]
 The majority outlines how this regulation derives from language contained in congressional reports relevant to the 1996 legislationSee ante at 89.