404 F.3d 638
 GREEN MOUNTAIN RAILROAD CORPORATION, Plaintiff-Appellee,
v.
State of VERMONT, Vermont Agency of Natural Resources and William H. Sorrell, as Attorney General of the State of Vermont, Defendants-Appellants.
No. 04-0366-CV.
 United States Court of Appeals, Second Circuit.
 Argued: December 6, 2004.
 Decided: April 14, 2005.
 
 Jeanne Elias, Assistant Attorney General for the State of Vermont, (Rebecca M. Ellis, Bridget Asay, Assistant Attorneys General, on the brief) Montpelier, VT, for Defendants-Appellants.
 Robert B. Luce, (Eric A. Poehlmann, on the brief) Downs Rachlin Martin PLLC, Burlington, VT, for Plaintiff-Appellee.
 Evelyn G. Kitay (Ellen D. Hanson, General Counsel, on the brief) Washington, D.C. for Amicus Curiae Surface Transportation Board.
 Robert M. Jenkins III, David M. Gossett, Mayer Brown Rowe & Maw LLP, Washington D.C.; Louis P. Warchot, Dennis J. Starks, Association of American Railroads, Washington, D.C.; George A. Aspatore, Sarah J. Bailiff, Paul Guthrie, Thomas J. Healey, Paul R. Hitchcock, Theodore K. Kalick, Robert T. Opal, Louise Anne Rinn, Peter J. Shudtz, Sidney L. Strickland, Jr., of Counsel, on submission, for Amicus Curiae Association of American Railroads.
 Before: CARDAMONE, JACOBS, CABRANES, Circuit Judges.
 JACOBS, Circuit Judge.
 
 
 1
 Green Mountain Railroad Corporation ("Green Mountain") proposed to build transloading facilities on its property in Vermont, and brings this action seeking a declaration that Vermont's environmental land use statute, Act 250, Vt. Stat. Ann. Tit. 10, § 6001 et seq., is for that purpose preempted by the Interstate Commerce Commission Termination Act of 1995, 49 U.S.C. § 10101 et seq. (the "Termination Act"). The State of Vermont, its Agency of Natural Resources and the State Attorney General appeal from a judgment entered in the United States District Court for the District of Vermont (Murtha, J.), granting Green Mountain's motion for summary judgment on the preemption ground. Green Mountain R.R. Corp. v. Vermont, No. 01-CV-181, 2003 U.S. Dist. LEXIS 23774, at *2-3 (D.Vt. Dec. 15, 2003).
 
 
 2
 The Termination Act expressly preempts "remedies provided under Federal or State law" and vests with the Surface Transportation Board (the "Transportation Board"), a federal agency, exclusive jurisdiction over "transportation by rail carriers" and "the construction ... of ... facilities...." 49 U.S.C. § 10501(b). The term "transportation" includes a "warehouse... yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail." 49 U.S.C. § 10102.
 
 
 3
 "We review a district court's grant of summary judgment de novo." See Young v. County of Fulton, 160 F.3d 899, 902 (2d Cir.1998). In so doing, we construe the evidence in the light most favorable to the State as the non-moving party, and draw all reasonable inferences in its favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For the reasons that follow, we affirm.
 
 
 4
 * Green Mountain is a "rail carrier" as defined by the Termination Act, 49 U.S.C. § 10102(5), with 52 miles of track between Rutland, Vermont and Cold River, New Hampshire. The line serves transhipping industries, i.e., industries that rely on trucks to transport goods from the rail site for processing elsewhere. Along its rail line in Rockingham, Vermont, Green Mountain owns a 66-acre tract known as "Riverside," bounded by the Connecticut River on the east. Portions of Riverside are wetlands unusable for development.
 
 
 5
 Green Mountain proposed to build facilities at Riverside to serve the following operations: (1) unloading bulk salt arriving by rail for local distribution by truck or for temporary storage in a shed pending distribution; (2) temporary storage and transport of "non-bulk goods, such as steel pipe[s]"; and (3) unloading bulk cement arriving by rail for storage in silos and eventual transport by truck. Some of these operations are conducted within a 100-foot strip alongside the Green Mountain tracks and the Connecticut River.
 
 
 6
 Vermont argues that construction of the transloading facilities is subject to Act 250, an environmental land use statute that mandates preconstruction permits for land development. Permit applications are filed with one of nine District Commissions that evaluate environmental impact using ten criteria, including: "undue water or air pollution," Vt. Stat. Ann. Tit. 10, § 6086(a)(1), and "undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites or rare and irreplaceable natural areas," Vt. Stat. Ann. Tit. 10, § 6086(a)(8). The District Commission's decisions are appealable to Vermont's Environmental Board; decisions of the Environmental Board are appealable directly to the Vermont Supreme Court. Vt. Stat. Ann. Tit. 10, § 6089(a) & (b). Most permit decisions under Act 250 are issued within 60 days from the filing of an application.[1]
 
 
 7
 In 1997, PMI Lumber leased part of Riverside and applied for an Act 250 construction permit. PMI Lumber proposed to satisfy environmental criteria by a 75-foot buffer zone along the river. The Vermont Agency of Natural Resources recommended that the buffer be increased to 100 feet.
 
 
 8
 A local permitting agency subsequently issued Land Use Permit # 2W0038-2 (the "dash-2 permit") in the names of PMI Lumber and Green Mountain. Condition 14 required maintenance of a 100-foot buffer zone. When PMI Lumber ceased operations at the site, Green Mountain used it for its transloading activities. Green Mountain encroached on the buffer zone with a settling pond, storage of materials, and vehicles.
 
 
 9
 In Spring 1998, Green Mountain sought to amend the dash-2 permit to allow construction of a 100-foot by 275-foot salt storage shed. In January 1999, the State granted Land Use Permit # 2W0038-3 (the "dash-3 permit"), which stipulated conditions, including that the shed be rectangular, and either brown or dark green. Several months later, in October 1999, Green Mountain applied for another permit amendment (the "dash-3B permit" application) to modify the size, color and location of the salt shed. Although no such permit issued, Green Mountain started construction of its modified salt shed in November 1999.
 
 
 10
 In January 2000, the State issued a notice of violation of the dash-2 permit, citing (among other things) storage of materials within the 100-foot buffer zone. The State issued a second notice of violation in February 2000, alleging construction of the salt shed without the dash-3B permit.
 
 
 11
 In Spring 2000, the State conducted hearings on Green Mountain's dash-3B salt shed permit application. Green Mountain objected orally and in writing that the State Environmental Commission lacked jurisdiction to adjudicate the pending permit application because the Termination Act, which expressly preempts "remedies provided under Federal or State law" and vests with the Transportation Board, a federal agency, exclusive jurisdiction over "transportation by rail carriers," 49 U.S.C. § 10501, preempts Act 250.
 
 
 12
 Faced with the threatened enforcement of Act 250, Green Mountain filed this suit in June 2001, seeking a declaration that the Termination Act preempts Act 250. Simultaneously, Green Mountain requested a declaratory order to the same effect from the Transportation Board.
 
 
 13
 The Transportation Board denied the declaratory relief in May 2002, deferring to the district court. In the meantime, the State moved to dismiss the district court action. While that motion was pending, the State issued the dash-3B permit in August 2001. A month later, the district court granted the State's motion to dismiss Green Mountain's facial challenge to the applicability of Act 250, but ordered "further development of the record" to determine whether the State's "effort to enforce one or more conditions of the [dash-2] Permit violates the [Termination Act] in this particular case." Green Mountain R.R., No. 1: 01CV181, 2003 U.S. Dist. LEXIS 23774, at *2 (quoting an earlier ruling) (internal quotation marks omitted).
 
 
 14
 Following discovery, the parties cross-moved for summary judgment. On December 15, 2003, the court granted Green Mountain's motion (and denied the State's motion) on the ground that "the state's efforts to enforce Act 250 in this case are preempted under the [Termination Act]." Id.
 
 II
 
 15
 The question presented is whether the Termination Act preempts Vermont's Act 250 with respect to the underlying permit controversy. State law is preempted by federal law when: (1) the preemptive intent is "`explicitly stated in [a federal] statute's language or implicitly contained in its structure and purpose'"; (2) state law "actually conflicts with federal law"; or (3) "federal law so thoroughly occupies a legislative field `as to make reasonable the inference that Congress left no room for the States to supplement it.'" Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (quoting Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977), and Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta, 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982)). The "ultimate touch-stone" of preemption analysis is congressional intent: "Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it." Medtronic, Inc. v. Lohr, 518 U.S. 470, 485-86, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (internal quotation marks omitted).
 
 
 16
 The Termination Act contains an express preemption clause:
 
 
 17
 Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.
 
 
 18
 49 U.S.C. § 10501(b). The Termination Act Section 10501 vests the Transportation Board with exclusive jurisdiction over "transportation by rail carriers" and "the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State." 49 U.S.C. § 10501(b). "Transportation" is expansively defined to include: "a locomotive, car, vehicle, vessel, warehouse . . . yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail." 49 U.S.C. § 10102(9). Certainly, the plain language grants the Transportation Board wide authority over the transloading and storage facilities undertaken by Green Mountain. See City of Auburn v. United States, 154 F.3d 1025, 1029-31 (9th Cir.1998); see also R.R. Ventures, Inc. v. STB, 299 F.3d 523, 530 (6th Cir.2002) ("[I]f a railroad line falls within its jurisdiction, the [Transportation Board's] authority over abandonment is both exclusive and plenary.").
 
 
 19
 Other federal courts recognize that the Termination Act preempts most pre-construction permit requirements imposed by states and localities. See, e.g., City of Auburn, 154 F.3d at 1030-31 (affirming the Transportation Board's finding that the Termination Act preempted a local environmental permitting requirement); Soo Line R.R. Co. v. City of Minneapolis, 38 F.Supp.2d 1096, 1101 (D.Minn.1998) ("The Court concludes that the City's demolition permitting process upon which Defendants have relied to prevent [the railroad] from demolishing five buildings . . . that are related to the movement of property by rail is expressly preempted by the [Termination Act]."); CSX Transp., Inc. v. Ga. Pub. Serv. Comm'n, 944 F.Supp. 1573, 1585 (N.D.Ga.1996) (finding state regulation of railroad agency closing preempted by the Termination Act).
 
 
 20
 For example, the Ninth Circuit concluded, in affirming a Transportation Board decision, that the Termination Act preempted state and local environmental regulations requiring a railway to submit to a permitting process before making repairs and improvements on its track line. City of Auburn, 154 F.3d at 1027-28, 1030-31. "[C]ongressional intent is clear, and the preemption of rail activity is a valid exercise of congressional power under the Commerce Clause." Id. at 1031; see also Ga. Pub. Serv. Comm'n, 944 F.Supp. at 1580-82.
 
 
 21
 The Transportation Board has likewise ruled that "state and local permitting or preclearance requirements (including environmental requirements) are preempted because by their nature they unduly interfere with interstate commerce." Joint Petition for and Declaratory Order — Boston and Maine Corp. and Town of Ayer, MA, STB Finance Docket No. 33971, 2001 WL 458685, at *5 (S.T.B. Apr. 30, 2001), aff'd, Boston & Maine Corp. v. Town of Ayer, 191 F.Supp.2d 257 (D.Mass.2002)(affirming the Transportation Board's determination that town's pre-construction permit requirement was preempted by the Termination Act); see also Green Mountain R.R. Corp., Petition for Declaratory Order, STB Finance Docket No. 34052, 2002 WL 1058001 (S.T.B. May 24, 2002). As the agency authorized by Congress to administer the Termination Act, the Transportation Board is "`uniquely qualified to determine whether state law . . . should be preempted'" by the Termination Act.[2] Ga. Pub. Serv. Comm'n, 944 F.Supp. at 1584 (quoting Medtronic, 518 U.S. at 496, 116 S.Ct. 2240).
 
 
 22
 Like the regulations and ordinances consistently struck down by federal courts and by the Transportation Board, Act 250 mandates a pre-construction permit. Act 250's pre-construction permit requirement is preempted for two reasons: (i) it "unduly interfere[s] with interstate commerce by giving the local body the ability to deny the carrier the right to construct facilities or conduct operations," Town of Ayer, STB Finance Docket No. 33971, 2001 WL 458685, at *5; and (ii) it can be time-consuming, allowing a local body to delay construction of railroad facilities almost indefinitely. Green Mountain R.R. Corp., 2003 U.S. Dist. LEXIS 23774, at *13.
 
 
 23
 Nevertheless, as the district court observed, "not all state and local regulations are preempted [by the Termination Act]; local bodies retain certain police powers which protect public health and safety." Id. It therefore appears that states and towns may exercise traditional police powers over the development of railroad property, at least to the extent that the regulations protect public health and safety, are settled and defined, can be obeyed with reasonable certainty, entail no extended or open-ended delays, and can be approved (or rejected) without the exercise of discretion on subjective questions. Electrical, plumbing and fire codes, direct environmental regulations enacted for the protection of the public health and safety, and other generally applicable, non-discriminatory regulations and permit requirements would seem to withstand preemption. Cf. Vill. of Ridgefield Park v. New York, Susquehanna & W. Ry. Corp., 163 N.J. 446, 750 A.2d 57, 64 (2000) (noting the Transportation Board's position that: (1) "while state and local government entities . . . retain certain police powers and may apply non-discriminatory regulation to protect public health and safety, their actions must not have the effect of foreclosing or restricting the railroad's ability to conduct its operations or otherwise unreasonably burdening interstate commerce"; and (2) "railroads are exempt from the traditional permitting process but not . . . from most other generally applicable laws").
 
 
 24
 The legislative history of the Termination Act supports this approach: "Although States retain the police powers reserved by the Constitution, the Federal scheme of economic regulation and deregulation is intended to address and encompass all such regulation and to be completely exclusive." See H.R.Rep. No. 104-311, at 96 (1995), reprinted in 1995 U.S.C.C.A.N. 793, 808. We need not draw a line that divides local regulations between those that are preempted and those that are not, because in this case preemption is clear: the railroad is restrained from development until a permit is issued; the requirements for the permit are not set forth in any schedule or regulation that the railroad can consult in order to assure compliance; and the issuance of the permit awaits and depends upon the discretionary rulings of a state or local agency.
 
 III
 
 25
 The State's primary appellate argument is that Act 250 cannot be preempted on its face unless there is "no possible set of conditions that [the permitting authority] could place on its permit that would not conflict with federal law." See Cal. Coastal Comm'n v. Granite Rock Co., 480 U.S. 572, 580, 107 S.Ct. 1419, 94 L.Ed.2d 577 (1987) (applying facial challenge standard in a statutory preemption case). We disagree. No doubt, there could be permit applications affecting railroad facilities that could be promptly approved without the slightest imposition on rail operations. However, what is preempted here is the permitting process itself, not the length or outcome of that process in particular cases. Cf. Chamber of Commerce v. Lockyer, 364 F.3d 1154, 1169 (9th Cir.2004) (noting that in certain situations federal law preempts "the act of regulation itself, not the effect of the state regulation in a specific factual situation"). California Coastal Commission is easily distinguished on that basis, as well as on the absence of a preemption provision.[3]
 
 
 26
 "The facial/as-applied distinction would be relevant only if we might find some applications of the statute preempted and others not. . . . [W]here a state statute is in direct conflict" with a federal statute "or one of its processes," the "focus is the act of regulation itself, not the effect of the state regulation in a specific factual situation." Lockyer, 364 F.3d at 1169.
 
 IV
 
 27
 The State argues that Act 250 withstands preemption because it is an environmental, rather than economic, regulation. The distinction is not useful. "[I]f local authorities have the ability to impose `environmental' permitting regulations on the railroad, such power will in fact amount to `economic regulation' if the carrier is prevented from constructing, acquiring, operating, abandoning, or discontinuing a line." City of Auburn, 154 F.3d at 1031. Green Mountain serves industries that rely on trucks to transport goods from the rail site for processing; so the proposed transloading and storage facilities are integral to the railroad's operation and are easily encompassed within the Transportation Board's exclusive jurisdiction over "rail transportation." Notwithstanding the environmental goals of the legislation, Act 250's permitting process "necessarily interfere[s]" with Green Mountain's "ability to construct facilities and conduct economic activities." Green Mountain R.R. Corp., 2003 U.S. Dist. LEXIS 23774, at *13.
 
 V
 
 28
 The State argues that Ace Auto Body & Towing, Ltd. v. City of New York, 171 F.3d 765 (2d Cir.1999), compels a different conclusion. In Ace Auto Body, this Court held that the section of the Termination Act relating to motor carrier operations (49 U.S.C. § 14501) did not preempt New York's police power to suppress the practice of "chasing," whereby tow trucks compete for business by racing ("often recklessly") to accidents broadcast on police radio frequencies. Ace Auto Body, 171 F.3d at 769, 779. The State's reliance on Ace Auto Body is misplaced. The federal preemption language at issue in that case provides that a state or municipality "may not enact or enforce a law . . . related to a price, route, or service of any motor carrier. . . with respect to the transportation of property." Id. at 770 (quoting 49 U.S.C. § 14501(c)(1)). The Court held that the "related to" phrase focused the preemption on economic regulations and reflected congressional intent to leave the state's historic police powers undisturbed where "only incidental economic burdens can be discerned." Id. at 774. We concluded that the chasing regulations were "sufficiently safety-oriented" while having no more than an incidental economic effect on the industry. Id.
 
 
 29
 In contrast to the federal statute at issue in Ace Auto Body, the plain language of Section 10501 reflects clear congressional intent to preempt state and local regulation of integral rail facilities. "It is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations." Ga. Pub. Serv. Comm'n, 944 F.Supp. at 1581 (holding that the Termination Act preempted state regulation of railroad agency closing). We therefore need not conduct a fact-based inquiry weighing the economic impact of Act 250's permitting process upon Green Mountain; based on the facts before the Court, the State's effort to regulate rail transportation through the Act 250 pre-permitting process is necessarily preempted by the Termination Act.
 
 CONCLUSION
 
 30
 For the foregoing reasons, we affirm the judgment of the district court.
 
 
 
 Notes:
 
 
 [1]
 Green Mountain contends that this expedited schedule (as cited by the State) applies only to "minor" amendments to existing permits, whereas its proposal is likely to be treated as a "major" application. State statistics collected from January 1998 through December 2002 indicate that the average timetable for "major" permit applications was 303.39 days. More than half of landowner appeals of District Commission decisions to the Vermont Environmental board took more than nine months in 2001
 
 
 [2]
 Whether the Transportation Board is entitled to deference underChevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) is not material to the Court's decision. We therefore decline to reach the issue.
 
 
 [3]
 InCalifornia Coastal Commission, a mining company sought to enjoin a state agency from requiring the company to obtain a permit to mine on federal land. The Supreme Court ruled that in the federal mining statutes, "Congress specifically disclaimed any intention to pre-empt pre-existing state authority" and that the federal mining statute "does not automatically pre-empt all state regulation of activities on federal lands." 480 U.S. at 593, 107 S.Ct. 1419. The federal mining statutes required that land-use plans of the federal agency charged with administering the federal mining statutes "provide for compliance with" existing state and federal environmental laws. Id. at 587, 107 S.Ct. 1419 (internal quotation marks omitted). Because the mining company sought injunctive relief "before discovering what conditions the Coastal Commission would have placed on the permit," the Court concluded that the mining company's "case must stand or fall on the question whether any possible set of conditions attached to the Coastal Commission's permit requirement would be pre-empted." Id. at 588, 107 S.Ct. 1419.
 Vermont failed to raise explicitly this facial preemption argument with the district court. As a result, the district court's opinion does not discuss California Coastal Commission. Generally, we do not consider an issue raised for the first time on appeal. See Silverman v. Mut. Benefit Life Ins. Co., 138 F.3d 98, 103 (2d Cir.1998). However, Vermont points out that, although it never cited to California Coastal Commission in its submissions to the district court, it preserved this issue for appellate review by arguing, in its August 2001 reply to Green Mountain's opposition to its motion to dismiss, that to succeed on its facial preemption claim, Green Mountain was obligated to show "that there are no circumstances under which Act 250 could be found constitutional," and did not press the argument thereafter because it believed that the district court adopted the State's position on facial preemption when it stated, granting in part the State's motion to dismiss: "to the extent the [State] ask[s] the Court to dismiss Green Mountain's claim that the [Termination Act] preempts Act 250 under all circumstances, the motion is granted."