428 F.3d 138
 CONNECTICUT DEPARTMENT OF SOCIAL SERVICES, Patricia Wilson-Coker, Commissioner of Social Services, and Philip Myrun and Confesora Santiago, on behalf of themselves and all others similarly situated, Plaintiffs-Appellees,
v.
Michael O. LEAVITT, Secretary of the Department of Health and Human Services,* Defendant-Appellant.
 Docket No. 03-6052.
 United States Court of Appeals, Second Circuit.
 Argued November 5, 2004.
 Decided October 28, 2005.
 
 COPYRIGHT MATERIAL OMITTED Alisa B. Klein, Attorney, Appellate Staff, Civil Division, Department of Justice, Washington, DC (John A. Danaher, III, United States Attorney for the District of Connecticut; Peter D. Keisler, Assistant Attorney General; and Mark B. Stern, Attorney, Appellate Staff, Civil Division, on the brief; Alex M. Azar II, General Counsel, Sheree R. Kanner, Associate General Counsel, Henry R. Goldberg, Deputy Associate General Counsel, and Donald H. Romano, Senior Attorney, U.S. Department of Health and Human Services, of counsel), for Defendant-Appellant.
 Gill Deford, Center for Medicare Advocacy, Inc., Willimantic, Connecticut (Judith A. Stein, Brad S. Plebani, Willimantic, Connecticut; Patricia Nemore, Washington, DC; and Keith Bradoc Gallant, Cummings & Lockwood, LLC, New Haven, Connecticut, on the brief), for Plaintiffs-Appellees Myrun and Santiago.
 Maite Barainca, Assistant Attorney General, Hartford, Connecticut, (Richard Blumenthal, Attorney General for the State of Connecticut, Thomas J. Ring and Richard J. Lynch, Assistant Attorneys General, on the brief), for Plaintiffs-Appellees Connecticut Department of Social Services and Wilson-Coker.
 Before: WALKER, Chief Judge, FEINBERG and WESLEY, Circuit Judges.
 JOHN M. WALKER, Jr., Chief Judge.
 
 
 1
 This case is, at bottom, a dispute between the State of Connecticut and the federal government over how to determine which of them shall pay certain health-care costs. In particular, the issue is whether Medicaid or Medicare will pay for certain health-care services provided to patients in their homes ("home health-care services").
 
 
 2
 In 1999, the Connecticut Department of Social Services and its director, together with a class of Connecticut residents eligible for both Medicaid and Medicare, sued the Secretary of Health and Human Services in the United States District Court for the District of Connecticut (Stefan R. Underhill, Judge) to change the way certain Medicare claims for home health-care services are handled on behalf of the Secretary. Three years later, in 2002, on cross-motions for summary judgment, the district court largely ruled in the plaintiffs' favor,[1] while granting summary judgment in the Secretary's favor on some claims. See Conn. State Dep't of Soc. Servs. v. Thompson ["Conn. DSS"], 242 F.Supp.2d 127, 132 (D.Conn.2002). By order entered February 20, 2003, and judgment entered February 27, 2003, the district court directed the Secretary to implement certain claims-processing practices sought by the plaintiffs. See Conn. DSS v. Thompson, 2003 WL 21087882 (D.Conn. Jan.8, 2003) (order entered February 20, 2003). Following this appeal by the Secretary, we reverse the district court's judgment.
 
 I. BACKGROUND
 
 3
 Medicaid is a health insurance program, jointly funded by the state and federal governments, that pays for health care for America's poor. See Medicaid Act (Title XIX of the Social Security Act), 42 U.S.C. § 1396 et seq. The federal and state governments share the cost of Medicaid roughly equally, but state governments administer the program. The Connecticut Department of Social Services ("Connecticut" or "the state"), one of the plaintiffs in this case, administers Connecticut's Medicaid program.
 
 
 4
 Medicare is the federal government's health-insurance program for the elderly. See Medicare Act (Title XVIII of the Social Security Act), 42 U.S.C. § 1395 et seq. Medicare has two parts, Parts A and B.[2] This dispute concerns payment for home health-care services, which are covered under Medicare Part A and provided by institutions called home health-care agencies ("HHAs" or "providers"). The state does not participate in the Medicare program.
 
 
 5
 Because elderly Americans are covered by Medicare, and poor Americans are covered by Medicaid, the elderly poor are covered by both programs. These beneficiaries are known as "dual eligibles." Sometimes both Medicaid and Medicare cover home health-care services provided to a dual eligible. See 42 U.S.C. § 1395d(a)(3) (Medicare coverage of home health-care services), § 1396a(a)(10)(D) (Medicaid coverage of same). When this occurs, federal law dictates that Medicare, not Medicaid, bear the cost, because Medicaid is designed to be a payer of last resort. See id. § 1396a(a)(25) (requiring Medicaid programs to seek reimbursement, if doing so is cost-effective, from liable third parties). But sometimes a state Medicaid agency mistakenly pays for Medicare-covered home health-care services. Because the state pays half of Medicaid costs and none of Medicare costs, the state has an interest in securing Medicare coverage, after the fact, for that part of the cost of Medicare-covered home health-care services provided to dual eligibles that Medicaid erroneously paid in the first place. When Medicare covers services already paid for by Medicaid, Medicare pays the provider for the services, and then Medicaid can seek reimbursement from the provider for Medicaid's initial erroneous payment. Indeed, the state has a legal obligation to seek such reimbursement. Id.
 
 
 6
 Medicare is overseen, at the federal level, by the Center for Medicare and Medicaid Services ("CMS"),[3] a division of the Department of Health and Human Services ("HHS"). CMS does not, however, directly pay Medicare claims. Instead, CMS contracts out claim processing to entities known as "fiscal intermediaries."[4] Connecticut therefore must deal with a fiscal intermediary to secure Medicare coverage for home health-care services previously paid for by Medicaid. Although a number of fiscal intermediaries process claims for Medicare beneficiaries in Connecticut, this lawsuit involves only one such intermediary, United Government Services ("UGS").
 
 
 7
 Connecticut is unhappy with how UGS responds, if at all, to the state's efforts to secure Medicare coverage of home health-care services provided to dual eligibles when the state's Medicaid program has previously paid for the services. To remedy UGS's perceived failings, Connecticut brought this federal suit against the Secretary of HHS, who oversees CMS, which in turn oversees UGS and is ultimately responsible for UGS's actions.
 
 
 8
 The other plaintiffs in this suit are the dual eligibles themselves, certified as a class by the district court. See Conn. DSS, 242 F.Supp.2d at 131 n. 3. The dual eligibles care whether Medicare or Medicaid pays for their home health-care services because if Medicaid pays and is not reimbursed, Connecticut may levy against their estates for the cost of services provided while they were living. See 42 U.S.C. § 1396p (providing for recovery by Medicaid agencies from beneficiaries); see also Conn. Gen.Stat. § 17b-93(a); State v. Marks, 239 Conn. 471, 686 A.2d 969, 971-72 (1996). The dual eligibles are represented in this suit by the Center for Medicare Advocacy ("the Center"), a public-interest law firm that has also been hired by Connecticut to seek from UGS Medicare-coverage determinations for home health-care services provided to dual eligibles.
 
 
 9
 On cross-motions for summary judgment, the district court granted summary judgment on most claims in the plaintiffs' favor, holding that in many respects, UGS's practices violate federal laws and regulations as well as the Fifth Amendment's Due Process Clause. Conn. DSS, 242 F.Supp.2d at 127. The Secretary has appealed. The district court also granted summary judgment in the Secretary's favor on certain of the plaintiffs' claims, which do not concern us because the plaintiffs have not cross-appealed the denial of those claims. Our jurisdiction is under 28 U.S.C. § 1291.[5] As to the claims on appeal, we reverse the district court and remand for entry of judgment in favor of the defendant.
 
 II. DISCUSSION
 
 10
 We review de novo the district court's grant of summary judgment to Connecticut and the dual eligibles. See, e.g., Green Mountain R.R. Corp. v. Vermont, 404 F.3d 638, 639 (2d Cir.2005). The parties conceded below that the material facts were undisputed and that the only controverted questions were matters of law. See Conn. DSS, 242 F.Supp.2d at 131.
 
 
 11
 The plaintiffs' complaint alleged broadly that the Secretary violated the Medicare statutes and regulations as well as the Fifth Amendment's Due Process Clause by "fail[ing] to require [UGS] to provide timely, written, and accurate initial determinations [and reconsideration decisions] on Medicare claims for home health care services in Connecticut." More specifically, the plaintiffs asked the district court to enjoin the Secretary from:
 
 
 12
 i. failing to enforce the requirement that written decisions be sent to the beneficiary and his or her representative which articulate clearly the reasons for resolution of the claim;
 
 
 13
 ii. failing to enforce the requirement that an initial determination on a "clean claim" be made within 30 days of submission of the claim . . . and that all initial determinations be issued within a reasonable period of time after submission of the claim;
 
 
 14
 iii. failing to monitor [UGS] on a regular basis to ensure that its initial determinations reflect a consistently accurate interpretation and application of the Medicare statute, regulations, and guidelines; [and]
 
 
 15
 iv. failing to evaluate and assess the performance of [UGS] on a regular basis . . . .
 
 
 16
 The district court construed the plaintiffs' complaint as raising four challenges to the Secretary's and UGS's practices: 1) that UGS wrongly refused to issue "notices of initial determination" on claims submitted by beneficiaries; 2) that UGS's explanations of its decisions on claims were inadequate; 3) that UGS wrongly refused to send copies of its decisions on claims to beneficiaries' representatives; and 4) that the Secretary failed to ensure that UGS made sufficiently timely and accurate decisions on claims. Conn. DSS, 242 F.Supp.2d at 143. As to this fourth issue, the district court ruled against the plaintiffs, and they have not cross-appealed. We therefore review only the first three issues, on which the district court granted summary judgment to the plaintiffs.
 
 
 17
 A. The dispute over when notices of initial determinations should issue
 
 
 18
 The first step on the road to reimbursement from Medicare is, as with any insurance program, filing a claim. The second step is called an "initial determination": this is a first decision by a fiscal intermediary, here UGS, as to whether it will pay the claim. 42 U.S.C. § 1395ff(a). The initial determination is followed by a "notice of initial determination" by UGS reflecting its coverage decision. See 42 C.F.R. § 405.702; see also 42 U.S.C. § 1395ff(a)(4). If UGS issues a notice of initial determination refusing to pay a claim, the beneficiary can appeal. See 42 U.S.C. § 1395ff(b); 42 C.F.R. § 405.701-.730. Without a notice of initial determination, however, there is nothing to appeal. In effect, if UGS fails to issue a notice of initial determination on a claim, the claim might as well not exist; it will not be paid, and there is no way to appeal its nonpayment.
 
 
 19
 Among the many issues in this case, a central one is this: how can Connecticut ensure that Medicare pays for covered home health-care services provided by HHAs if those HHAs never submit claims to UGS, or if they submit procedurally defective claims that UGS refuses to process? For in either situation, UGS will make no initial determination and issue no notice. The claim will not be paid, and the nonpayment will be unappealable.
 
 
 20
 Connecticut has an answer: if a provider fails to file a claim (or files a procedurally defective claim), then Connecticut, standing in the beneficiary's shoes, may do so.[6] The Secretary disagrees. According to the Secretary, claims for home health-care services may be filed only by providers, not beneficiaries or their representatives or subrogees. The Secretary therefore argues that UGS has no obligation to make initial determinations in response to claims for home health-care services filed by beneficiaries. The district court sided with Connecticut and ruled that beneficiaries have the right to file claims directly with UGS and to receive notices of initial determination on those claims, whether an HHA has filed a procedurally defective claim or no claim at all.[7] Conn. DSS, 242 F.Supp.2d at 146. The district court based its ruling both on the Medicare statute and regulations, and on the Fifth Amendment's Due Process Clause. Id. at 160. We disagree with the district court.
 
 
 21
 The Medicare regulations carefully define who may file certain kinds of claims. Home health-care agencies are defined as "providers," 42 C.F.R. § 400.202, and "[a]ll claims for services of providers . . . must be . . . [f]iled by the provider," id. § 424.33 (emphasis added). The regulations do not, therefore, contemplate that Medicare beneficiaries (or anyone acting on their behalf) will be permitted to file claims for home health-care services directly with an intermediary. Indeed, the regulation that governs direct claims by beneficiaries, 42 C.F.R. § 424.34, refers only to "[a] beneficiary's claim for direct payment for services furnished by a supplier [defined to exclude providers such as home health-care agencies, see id. § 400.202], or by a nonparticipating hospital that has not elected to claim payment for emergency services." Reading §§ 424.33 and 424.34 together indicates that beneficiaries may not directly file a claim for home health-care services.
 
 
 22
 The district court, however, relied upon a different regulation that, read in isolation, seems to suggest that Medicare beneficiaries may file claims for home health-care services directly with an intermediary. See Conn. DSS, 242 F.Supp.2d at 144. That regulation, entitled "Notice of initial determination" and found in the section of the Medicare regulations that governs appeals, states:
 
 
 23
 After a request for payment . . . is filed with the intermediary by or on behalf of the individual who received . . . home health services, and the intermediary has ascertained whether the items and services furnished are covered . . . and where appropriate, ascertained and made payment of amounts due or has ascertained that no payments were due, the individual will be notified in writing of the initial determination in his case.
 
 
 24
 42 C.F.R. § 405.702. This regulation envisions, by its terms, that a "request for payment" might be filed "by . . . [an] individual who received . . . home health services," in seeming contradiction with § 424.33, which states that only providers may file claims for such services.
 
 
 25
 The Secretary offers two approaches to harmonizing these seemingly contradictory regulations, neither of which is fully satisfactory. He first points out that the regulations permit beneficiaries to file directly certain claims — i.e., the claims specified in 42 C.F.R. § 424.34 (claims for services of suppliers and nonparticipating hospitals) — and contends that the regulations therefore "refer generally to claims filed `by or on behalf of the individual' that received services." But § 405.702 does not refer to the types of services for which beneficiaries may, under § 424.34, directly file claims. Instead, it refers only to services that "providers" furnish ("inpatient hospital services, extended care services, [and] home health services") and nonetheless allows for the possibility that a "request for payment" for such services could be filed "by. . . [an] individual."
 
 
 26
 Alternatively, the Secretary seeks to resolve the apparent contradiction between § 405.702 (which seems to allow beneficiaries to request initial determinations directly) and § 424.33 (which allows providers alone to file claims for their services) by treating the term "request for payment" as a "term of art" that refers to the claim form containing the beneficiary's signature. According to the Secretary, a "request for payment" is not an action, it is a piece of paper. This theory is both inadequate and implausible.
 
 
 27
 The term-of-art theory is inadequate because it neither renders § 405.702 comprehensible nor eliminates the troublesome contradiction between §§ 405.702 and 424.33. Suppose we accept the Secretary's invitation to read "request for payment" to mean the beneficiary's signature on a claim form. Section 405.702 would then require intermediaries to issue initial determinations after a beneficiary's signature on a claim form "is filed . . . by . . . the individual who received . . . home health services" (emphasis added). Simply redefining "request for payment" does not change the fact that § 405.702 allows individuals to file something (whether a claim form or simply a signature) directly with intermediaries while § 424.33 does not.
 
 
 28
 Further, it is implausible to us that "request for payment" is the term of art that the Secretary claims it is. Section 424.40, which deals specifically with signature requirements for Medicare claims, cuts both ways. The text of § 424.40 uses the term "request for payment statement" to refer to a piece of paper bearing the beneficiary's signature and authorizing a provider to file claims on his behalf. This suggests that the term of art describing this piece of paper is "request for payment statement," not "request for payment." On the other hand, the regulation is entitled "Request for payment effective for more than one claim," a usage consistent with the Secretary's position. Similarly, a regulation about payment of claims speaks of "obtain[ing], from the beneficiary . . ., a written request for payment to be made to the provider . . . ." Id. § 489.21(b)(4).
 
 
 29
 The term "request for payment" is not defined in the global definitions section of the Medicare regulations, 42 C.F.R. § 400.200. It is, however, defined in two other subparts of the regulations that both deal with penalties for violations. According to 42 C.F.R. § 402.3, "[r]equest for payment means an application submitted by a person to any person for payment for a service." The definition in 42 C.F.R. § 1003.101 is identical except that it covers "payment for an item or service." Although these definitions apply only to the subparts in which they are found, their existence suggests that if "request for payment" had a peculiar meaning — as the Secretary contends it does — in a different section of the Medicare regulations, that meaning would be spelled out in a definition section. It is not. We therefore reject the Secretary's term-of-art argument.
 
 
 30
 In short, there is a genuine contradiction within the Medicare regulations. For two reasons, we accept the Secretary's interpretation and hold, contrary to the district court, that as a matter of statutory and regulatory interpretation Medicare beneficiaries may not request initial determinations about home health-care claims directly from intermediaries. First, we owe "considerable deference" to the agency's interpretation of its own regulations. Encarnacion ex rel. George v. Barnhart, 331 F.3d 78, 86 (2d Cir.2003); see also Auer v. Robbins, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). That duty of deference counsels us to accept the Secretary's reasonable resolution of an apparent conflict between Medicare regulations. The Secretary's decision to treat as controlling the language of 42 C.F.R. § 424.33, which mandates that "[a]ll claims for services of providers . . . must be . . . [f]iled by the provider" is reasonable and therefore warrants our deference.
 
 
 31
 Second, Congress amended the governing statute effective October 1, 1999, to forbid coverage "for home health services . . . if the claim for payment for such services is not submitted by the agency." 42 U.S.C. § 1395y(a)(21), added by the Balanced Budget Act of 1997, Pub.L. No. 105-33, § 4603(c)(2)(C), 111 Stat. 251, 471. This change not only ratifies the Secretary's interpretation, it means that if we upheld the district court's injunction requiring UGS to provide initial determinations on claims submitted by beneficiaries, we necessarily would be finding the amended statute (and not just the Secretary's interpretation of the existing regulations) invalid.
 
 
 32
 Although the district court did not discuss 42 U.S.C. § 1395y(a)(21), which plainly allows only providers to file home health-care claims, the district court did hold that the Secretary (acting through UGS) violated the Due Process Clause of the Fifth Amendment by refusing to make initial determinations on claims filed by beneficiaries or their representatives. Conn. DSS, 242 F.Supp.2d at 155-60. Affirming this holding would also require us to find § 1395y(a)(21) unconstitutional, since the statute mandates the very practice that the district court found constitutionally wanting. Because we think that the Secretary does not violate Medicare beneficiaries' constitutional rights by declining to process claims for home health-care services filed by beneficiaries, we also reject the district court's constitutional ruling on this question.
 
 
 33
 The district court's constitutional ruling is somewhat difficult to review because the court did not explain why each of UGS's challenged practices violated beneficiaries' procedural due-process rights. Instead, the district court treated the challenged practices as a package, which it rejected in its entirety. Conn. DSS, 242 F.Supp.2d at 160 ("[T]he court concludes that UGS's procedures violate plaintiffs' due process rights."). We will analyze the constitutionality of each challenged practice separately.
 
 
 34
 The specific practice under discussion — UGS's refusal to process home health-care claims submitted by or on behalf of beneficiaries — does not violate beneficiaries' procedural due-process rights. As the district court properly observed, procedural due-process challenges are analyzed in terms of the familiar three-part test set out in Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The Mathews test requires us to consider: (1) the private interest at stake; (2) the risk of an erroneous deprivation of that interest occasioned by the challenged procedures and the probable additional value (if any) of different procedures; and (3) the government interest in adhering to the challenged procedures. Id.
 
 
 35
 Because Connecticut is not a "person" entitled to due-process protection, see South Carolina v. Katzenbach, 383 U.S. 301, 323-24, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966), the only private interest at stake is that of the plaintiff beneficiaries. Their affected interest is attenuated, though real. The plaintiffs are dually eligible for both Medicaid and Medicare; the crux of this case is Connecticut's desire to secure Medicare reimbursement, after the fact, for home health-care services for which the state Medicaid agency has already paid. UGS's challenged practices do not affect whether the beneficiaries receive needed services; the beneficiaries receive them, even under the current regime.
 
 
 36
 Instead, what is at stake for the beneficiaries is a potential diminution of their estates. Medicaid is authorized to recoup benefit payments from a deceased beneficiary's estate. See 42 U.S.C. § 1396p; Conn. Gen.Stat. § 17b-93(a); Marks, 686 A.2d at 971-72. But if Medicare reimburses Medicaid for home health-care services provided to a beneficiary, then Medicaid will necessarily have a smaller claim on the beneficiary's estate. We will assume for purposes of this opinion that a beneficiary's interest in minimizing the extent to which his or her estate may be diminished by Medicaid recoupment is a sufficient "legitimate claim of entitlement," see Bd. of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), to be considered a property right subject to procedural due-process protection.
 
 
 37
 Even so, we do not think that due process requires the additional procedural safeguard sought by the plaintiffs, i.e., the right for beneficiaries to file claims directly with Medicare. By hypothesis, these are claims that Medicare, not Medicaid, should have paid in the first instance. But for Medicaid to needlessly pay these claims, two things have to happen: first, the provider must (wrongly) file the claim with Medicaid, not Medicare, and second, Medicaid must (wrongly) pay the claim. Because the law already provides remedies for both of these errors, the additional procedure requested by the plaintiffs is unnecessary.
 
 
 38
 The best remedy, from the Secretary's perspective, would be prevention: if an HHA bills Medicaid for services that the Medicaid agency believes Medicare would cover, the Secretary would prefer Medicaid to refuse to pay and to insist that the HHA bill Medicare. The Medicaid agency would thus be practicing "cost avoidance," in CMS jargon. Cost avoidance contrasts with the historically common practice, which the Secretary aims to extinguish, of Medicaid agencies' paying claims first and asking questions later, or (again, in CMS jargon) "paying and chasing." In 2004, in an explanation that accompanied an order rescinding a rule that had allowed for extending the time in which to file a Medicare claim, CMS explained its preference for cost avoidance:
 
 
 39
 We also believe that the SOI procedures [i.e., the rescinded provision allowing for extensions of time to file Medicare claims] may contribute to States "paying and chasing" instead of following the required cost-avoidance procedures and to the incorrect submission of claims to Medicaid by providers. Our regulations at § 433.139(b) provide that, unless a waiver is granted under § 433.139(e), a State Medicaid agency that has established the probable existence of third party liability (including Medicare liability) at the time a claim for Medicaid payment is presented to it, must reject the claim and return it to the provider for a determination of liability. This process is known as cost avoidance. Some States, however, have been paying thousands of Medicaid claims, despite the knowledge that the beneficiaries involved are entitled to Medicare. These States subsequently identify a significant portion of the claims that they have paid as ones for which Medicare is the proper payor, and use the SOI procedures to extend the time for providers to file claims.
 
 
 40
 The fact that large numbers of claims are paid first by Medicaid and then identified as payable by Medicare raises the inference that providers are not as careful as they should be as to which payor they initially submit claims [to], and that States, by initially paying these claims, are not fully practicing cost avoidance. We are concerned that the availability of the SOI procedures to extend the time for filing claims is contributing to inappropriate behavior.
 
 
 41
 Medicare Program; Elimination of Statement of Intent Procedures for Filing Medicare Claims, 69 Fed.Reg. 21,963, 21,964 (Apr. 23, 2004) (to be codified at 42 C.F.R. pt. 424; rescinding 42 C.F.R. § 424.45 effective May 24, 2004). We see nothing unreasonable in CMS's expecting Medicaid agencies to ask questions first and pay later, which is precisely what the Medicaid regulations already require. See 42 C.F.R. § 433.139(b)(1) ("If the agency has established the probable existence of third party liability at the time the claim is filed, the agency must reject the claim and return it to the provider for a determination of the amount of liability.").
 
 
 42
 Another possible remedy is the "demand bill" procedure. CMS, through its internal operating procedures, requires HHAs that provide services to Medicare beneficiaries to warn beneficiaries in advance if the HHA does not expect Medicare to cover the services. See Program Memorandum A-02-018, CMS, HHS, at I.-3.B. (Feb. 26, 2002). The beneficiary can then accept or decline the services. If the beneficiary accepts the services, he or she must agree to be personally liable for them to the extent that no other payer (including Medicaid) covers the services. In addition, the beneficiary has the right to demand that the HHA bill Medicare, notwithstanding the HHA's prediction that Medicare will not provide coverage. This so-called demand bill must, like any other bill, be processed by a fiscal intermediary and will result in an appealable initial determination. The demand-bill procedure therefore currently provides a way for beneficiaries to receive an initial determination when an HHA chooses not to bill Medicare, which is precisely what the beneficiaries seek in this litigation.
 
 
 43
 Moreover, the demand-bill procedure has teeth. If an HHA refuses to file a demand bill upon a timely and proper request, CMS guidelines state that the HHA "will be prohibited from charging the beneficiary or other third-party payers [e.g., Medicaid]." Id. As CMS explained in a letter to directors of state Medicaid programs, when Medicaid has paid a Medicare-covered claim,
 
 
 44
 neither the Medicare nor Medicaid statute, nor HHS's regulations or policies prohibit any state from recouping its Medicaid payment from providers in the situation[] where. . . a beneficiary, beneficiary representative, or state (as the beneficiary's subrogee) timely requests the provider to file a claim with Medicare and the provider fails to submit timely a complete claim to Medicare for the service at issue, and/or fails to submit such documentation (including medical records) that the provider has or should have in order for the intermediary to make a substantive coverage determination on the claim for such service.
 
 
 45
 Letter from Dennis G. Smith, Director, Center for Medicaid and State Operations, CMS, HHS, to State Medicaid Directors (Apr. 8, 2003) (emphasis added), available at http://www.cms.hhs.gov/states/letters/smd040803.pdf. Given the strong incentives HHAs have to file demand bills upon request and the fact that if they do not, Medicaid can recoup its costs from the HHA (rather than the beneficiary's estate), we do not think the Constitution mandates that beneficiaries be allowed to file claims for home health-care services directly with intermediaries.[8]
 
 
 46
 But what if the Medicaid agency forgot to practice cost avoidance, and the beneficiary neglected to instruct the HHA to file a demand bill? Even in that situation, we believe that the Medicaid beneficiary's interest in preventing recoupment from his estate by Medicaid is adequately protected by existing provisions of state and federal law. Due process thus does not require the additional procedure sought in this litigation.
 
 
 47
 Under federal law, state Medicaid agencies are required to seek reimbursement from all available sources other than the beneficiary. See 42 U.S.C. § 1396a(a)(25). This suit involves services provided by HHAs and paid by Medicaid that should have been billed to Medicare. The HHAs themselves are therefore an obvious available source of reimbursement that the state must go to before levying on a beneficiary's estate. As noted above, CMS guidelines make HHAs liable to Medicaid if they refuse to file demand bills. And even if an HHA is not asked to file a demand bill, presumably the HHA is not entitled to hang on to a payment from Medicaid if that payment was the result of a wrongful bill submitted by the HHA. Normally, when a seller collects from a buyer money that the buyer did not actually owe to the seller, the buyer seeks a refund from the seller. Connecticut, the buyer, should be able to secure appropriate refunds from HHAs, the sellers.
 
 
 48
 Connecticut raises two objections to the suggestion that the state should recover directly from HHAs. First, the state points out that without an initial determination of Medicare coverage from UGS, the state cannot prove to the HHA that it should have billed Medicare instead of Medicaid. This may be true, but surely HHAs themselves have some contractual obligation to demonstrate that their bills to Medicaid are proper. This brings us to Connecticut's second objection: they do not know how to seek reimbursement from HHAs except by securing, after Medicaid has paid for services, an initial determination of coverage from UGS. That initial determination then leads to a payment from Medicare to the HHA for the relevant services, after which the state seeks a refund of what Medicaid paid for the services.
 
 
 49
 We can think of at least two (and perhaps three) other ways that Connecticut could secure refunds from HHAs. First, as the Secretary points out, Connecticut has contracts with the HHAs with which it does business. Unless those contracts include the improbable condition that Connecticut may never question an HHA's bill unless the state has, on its own, secured a coverage determination from Medicare, the state should be able to bring a state-law contract suit to require HHAs to disgorge payments for services that were improperly billed to Medicaid. And if Connecticut's contracts with HHAs are so unfavorable to the state that such suits are impossible, we do not think that the Due Process Clause is a suitable mechanism for amending those contracts. Nor do we think that the beneficiaries' interest in avoiding estate recovery is sufficiently threatened under the procedural regime defended by the Secretary to mandate the relief that the plaintiffs request.
 
 
 50
 Second, Connecticut might be able to sue as a third-party beneficiary of agreements filed by HHAs with CMS. Pursuant to 42 U.S.C. § 1395cc(a)(1), providers may not participate in Medicare unless they file with CMS a provider agreement that specifies that they will not charge beneficiaries or anyone else — such as a state Medicaid agency — for anything covered by Medicare. See also 42 C.F.R. § 489.21 (imposing same requirement on provider by regulation, though only with respect to beneficiaries). If HHAs have billed Medicaid for Medicare-covered services, they are in violation of their provider agreements. If a state Medicaid agency can prove that it is an intended third-party beneficiary of the provider agreement, the agency can sue under the provider agreement an HHA that wrongly bills Medicaid for Medicare-covered services.[9]
 
 
 51
 In short, beneficiaries' procedural due-process rights are not violated by Medicare's refusal to issue initial determinations in response to claims filed by beneficiaries. The interests of beneficiaries are sufficiently protected by: (1) the statutory requirement that Medicaid seek reimbursement from other sources before levying on a beneficiary's estate, and (2) the possibility that Medicaid can recover directly from HHAs for services that Medicare, not Medicaid, should have covered. Although it would doubtless be easier for Medicaid to recover such payments if it could approach the HHA with a determination of Medicare coverage from UGS in hand, the Constitution does not require the Secretary to make life more convenient for state Medicaid agencies.
 
 
 52
 B. The dispute over what notices of initial determinations should say
 
 
 53
 The district court determined that UGS's notices of initial determination, which are currently provided in the form of a Medicare Summary Notice ("MSN"), are defective because they "do[] not refer to the regulatory section that served as the basis for the denial." Conn. DSS, 242 F.Supp.2d at 148. It also found the notices defective because they "do[] not provide any information concerning a request for determination when the provider has failed to file a timely or complete claim." Id. at 147. The district court's judgment reflects these findings by ordering that future notices of initial determination must include "citation to the regulatory section(s) on which a denial of coverage is based, and (2) . . . when applicable,. . . the fact that the provider has not filed a complete and/or timely claim." Conn. DSS, 2003 WL 21087882, at *1 (order entered Feb. 20, 2003).
 
 
 54
 The district court erred in finding the MSNs defective on the basis that they do not include information about procedurally defective (incomplete or untimely) claims. The Medicare regulations require that a notice of initial determination "state in detail the basis for the determination." 42 C.F.R. § 405.702. As to procedurally defective claims, the plaintiffs complain not that UGS inadequately explains its denial of such claims, but rather that UGS refuses to issue notices of initial determination in relation to such claims when requested to do so by beneficiaries. We have already rejected the plaintiffs' argument that UGS must issue notices of initial determination in response to claims filed by beneficiaries, whether a provider has filed a procedurally defective claim or no claim at all. Because UGS is not required to say anything about procedurally defective claims in response to beneficiaries' requests, the MSNs cannot be considered defective on the basis that they omit information about such claims.
 
 
 55
 The district court also erred in finding the MSNs defective on the basis that they do not include statutory or regulatory citations. The Medicare statute directs UGS, when it denies a claim for home health-care services submitted by an HHA, to "furnish the provider and the individual with respect to whom the claim is made with a written explanation of the denial and of the statutory or regulatory basis for the denial . . . ." 42 U.S.C. § 1395h(j)(1) (emphasis added). In light of the statute's plain language, which strongly suggests that a statutory or regulatory citation would be proper, we reject the Secretary's argument on appeal that the district court should not have reached the issue of the notice of initial determination's content. Because the plaintiffs asserted in their complaint that UGS's notices of initial determination were inadequate and because the statutory language plainly raises the possibility that the notices might need to cite some legal authority, the Secretary was on notice of this issue.
 
 
 56
 Nonetheless, we agree with the Secretary that although § 1395h(j)(1) would permit UGS to include a statutory or regulatory citation in MSNs, the statute does not require that UGS do so. As the district court noted, a different section of the Medicare statute requires the Secretary to ensure that statutorily mandated notices are "`written in simple and clear language.'" Conn. DSS, 242 F.Supp.2d at 147 n. 24 (quoting 42 U.S.C. § 405(s)). This clear-language requirement is in tension with a requirement (imposed by the district court) that notices include statutory or regulatory citations. Further, the regulation that governs the content of notices of initial determination specifies only that those notices must "state in detail the basis for the determination." 42 C.F.R. § 405.702. This language does not necessarily contemplate, although it does not foreclose, a statutory or regulatory citation.
 
 
 57
 In light of the contradiction between the language of 42 U.S.C. § 1395h(j)(1) referring to the "statutory or regulatory basis" for coverage denial, and the "simple and clear language" requirement of § 405(s), we defer to the Secretary's reasonable interpretation of the Medicare statute and regulations as permitting UGS to issue notices of initial determination that do not include statutory or regulatory citations. See Auer, 519 U.S. at 461, 117 S.Ct. 905; Encarnacion, 331 F.3d at 86. Such notices must, of course, comply with the requirement in 42 C.F.R. § 405.702 that they "state in detail the basis for the determination." But because the only flaw that the plaintiffs have pointed to in the MSNs is the lack of a statutory or regulatory citation, there is no other basis for finding them legally inadequate.
 
 
 58
 Our holding on this point is bolstered by a recent amendment to the Medicare statute. In 2003, Congress amended the Medicare statutes to specify that a notice of initial determination
 
 
 59
 shall include (i) the reasons for the determination, including whether a local medical review policy or a local coverage determination was used; (ii) the procedures for obtaining additional information concerning the determination . . .; and (iii) notification of the right to seek a redetermination or otherwise appeal . . . .
 
 
 60
 42 U.S.C. § 1395ff(a)(4)(A), added by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub.L. No. 108-173, § 933, 117 Stat.2066, 2402. The amended statute goes on to specify that "the individual provided such written notice may obtain, upon request, information on the specific provision of the policy, manual, or regulation used in making the redetermination [sic — the subsection deals only with initial determinations]." Id. § 1395ff(a)(4)(C) (emphasis added). By specifying that a regulatory citation is available "upon request" after a notice of initial determination has been provided, the statute makes plain that the notice need not include such a citation in the first place.
 
 
 61
 Once again, we find that to uphold the district court's decision, we would be required to find an amended statute invalid. We decline to do so. We therefore also reverse the district court's holding that UGS's failure to include regulatory or statutory citations in MSNs violated the Due Process Clause of the Fifth Amendment. The district court failed to explain why due process required such citations, see Conn. DSS, 242 F.Supp.2d at 155-60, and the plaintiffs have not supplied the missing explanation.
 
 
 62
 C. The dispute over who should receive notices of initial determination
 
 
 63
 The district court held that UGS is required by the Medicare statute and regulations and the Constitution to issue notices of initial determination not only to dual eligibles, but also to their representatives. Id. at 149-52. Again, we disagree.
 
 
 64
 Medicare regulations specify that "notices [of initial determination] shall be mailed to the individual and the provider of services at their last known addresses." 42 C.F.R. § 405.702. They further specify that reconsideration notices (issued when a dual eligible appeals an initial determination) "shall be mailed by the CMS to the parties and their representatives at their last known addresses." Id. § 405.716 (emphasis added). Taken together, these two provisions are unambiguous. When a notice should go to a dual eligible's representative, the regulations say so. Section 405.702 says nothing about sending notices of initial determination to dual eligibles' representatives and therefore representatives are not entitled to such notices.
 
 
 65
 The district court, in refusing to give effect to the plain language of § 405.702, relied on regulations that apply to the Social Security Act as a whole (of which the Medicare Act is a part). See Conn. DSS, 242 F.Supp.2d at 150-51. One of those regulations, 20 C.F.R. § 404.1715(a), requires the Secretary to send Medicare beneficiaries' representatives "[n]otice and a copy of any administrative action, determination, or decision," which would logically include a notice of initial determination by UGS. Social Security Act regulations, however, only apply to Medicare to the extent that the Medicare-specific regulations do not contain "specific provisions" on a particular subject. See 42 C.F.R. § 405.701(c); see also Conn. DSS, 242 F.Supp.2d at 150. Contrary to the district court, we agree with the Secretary that 42 C.F.R. §§ 405.702 and 405.716 are "specific provisions" governing who must receive copies of notices of initial determination that take precedence over the general requirements in the Social Security Act regulations.
 
 
 66
 The district court did not explain why it believes that the Due Process Clause mandated that both beneficiaries and their representatives receive notices of initial determination. We hold that it does not; beneficiaries' interests are adequately protected by their own receipt of the notices.
 
 III. CONCLUSION
 
 67
 The judgment of the district court in favor of the plaintiffs is REVERSED.
 
 
 
 Notes:
 
 
 *
 The defendant in the district court was then-Secretary of Health and Human Services Tommy Thompson. We have substituted current Secretary Mike Leavitt for Thompson pursuant to Federal Rule of Appellate Procedure 43(c)(2)
 
 
 [1]
 For ease of exposition, when referring to the parties by their roles in the litigation, we will refer to the plaintiffs-appellees as simply "plaintiffs" and to the defendant-appellant as simply the "defendant."
 
 
 [2]
 Medicare Part A is open to all seniors, regardless of income, and covers care from institutional providers. Medicare Part B covers things like physician services; it is also open to all seniors regardless of income, but they must buy in to receive Part B coverage. Part B is not at issue in this case
 
 
 [3]
 CMS was formerly known as HCFA, the Health Care Financing Administration
 
 
 [4]
 Medicare pays for home health-care services through a special type of fiscal intermediary known as a "Regional Home Health Intermediary" or "RHHI."See Conn. DSS, 242 F.Supp.2d at 132. We use the term "fiscal intermediary" or simply "intermediary" to refer to RHHIs.
 
 
 [5]
 Although the Secretary objected below to the district court's subject-matter jurisdiction, he has not renewed these jurisdictional objections on appeal. We agree with the district court that, at the very least, the district court had jurisdiction pursuant to the federal mandamus statute, 28 U.S.C. § 1361See Conn. DSS, 242 F.Supp.2d at 140-42.
 
 
 [6]
 Medicaid beneficiaries must, as a condition of receiving benefits from the state, assign to the state their rights to payment from any other source, such as Medicare, for Medicaid-covered servicesSee 42 U.S.C. §§ 1396a(a)(25)(H), 1396k. Connecticut is therefore subrogated to whatever rights beneficiaries have against Medicare for payment of home health-care services. Connecticut has contracted with the Center to exercise the state's rights as the beneficiaries' subrogee. In addition, the Center is the legal representative of many beneficiaries, as well as class counsel for the plaintiff beneficiaries. References in this opinion to beneficiaries should therefore be read to include Connecticut, to the extent that it can exercise the beneficiaries' rights, and the Center, to the extent that it represents the beneficiaries.
 
 
 [7]
 We find it somewhat mysterious that UGS apparently rejects out of hand, without issuing a notice of initial determination, procedurally inadequate claims filed by HHAs. The Secretary defends the practice by arguing that under 42 C.F.R. § 405.702, "an intermediary will not [i.e., need not] issue an initial determination unless it has made a coverage determination, which it can do only if a proper claim has been filed." This is a questionable assertion in light of 42 C.F.R. § 405.704(b), which defines an initial determination quite broadly to reach any determination that affects whether a claim will be paid
 We do not reach the question whether UGS properly handles procedurally defective claims from HHAs, however, because the district court construed the plaintiffs' complaint to challenge only UGS's refusal to issue notices of initial determination on procedurally defective claims in response to requests from beneficiaries, not HHAs. Conn. DSS, 242 F.Supp.2d at 146 ("[P]laintiffs correctly aver that UGS's current procedure for handling requests for determinations [from beneficiaries] where the HHA has either failed to file a claim, or has filed an incomplete or late claim, violates the clear language of the Medicare regulations."). The plaintiffs do not argue on appeal that the district court misconstrued their complaint, and we therefore hold only that regardless of whether the law requires UGS to issue initial determinations in response to procedurally defective claims submitted by HHAs (which we were not asked, so do not answer), the law does not require UGS to issue initial determinations in response to requests from beneficiaries, whether an HHA has failed to submit a claim or has submitted a procedurally defective one.
 
 
 [8]
 CMS's guideline on demand bills seems to offer beneficiaries and Medicaid agencies both more and less protection than the governing statute and its implementing regulations. According to 42 U.S.C. § 1395cc(a)(1), providers may not participate in Medicare unless they file with CMS a provider agreement that specifies that they will not charge beneficiaries (or anyone else) for anything covered by MedicareSee also 42 C.F.R. § 489.21 (imposing same requirement on provider by regulation, though only with respect to beneficiaries).
 The demand-bill guideline seems to require that providers absorb charges whenever they refuse to submit a demand bill when requested, whether or not those charges are covered by Medicare, and thus goes beyond § 1395cc(a)(1). But the demand-bill guideline requires beneficiaries to timely request a demand bill before the guideline's prohibition on charging beneficiaries becomes effective. The statute, however, simply forbids providers (by means of the provider agreement) from charging anyone for Medicare-covered services; it does not require beneficiaries to insist up front that the provider bill Medicare. Under the statute, then, a beneficiary (or his subrogee the state Medicaid agency) should be able to require an HHA to refund its fees if, after having received services but without having requested a demand bill, the beneficiary discovers that Medicare would have covered services that the HHA did not bill to Medicare.
 
 
 [9]
 It is also possible that a Medicaid agency could sue an HHA directly for violating 42 U.S.C. § 1395cc(a)(1) (the provision that requires providers to agree to bill only Medicare for Medicare-covered services). This would, however, require implying a federal cause of action under the statute, which federal courts hesitate to doSee DiLaura v. Power Auth. of N.Y., 982 F.2d 73, 77-78 (2d Cir.1993) (discussing standards for implying a federal cause of action).